No. 14-10049

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CHRISTOPHER L. CRANE; DAVID A. ENGLE; ANASTASIA MARIE
CARROLL; RICARDO DIAZ; LORENZO GARZA; FELIX LUCIANO; TRE
REBSTOCK; FERNANDO SILVA; SAMUEL MARTIN; JAMES D. DOEBLER;
STATE OF MISSISSIPPI, by and through Governor Phil Bryant,

Plaintiffs–Appellants/Cross-Appellees,

v.

JEH CHARLES JOHNSON, SECRETARY, DEPARTMENT OF HOMELAND
SECURITY; JOHN SANDWEG, in His Official Capacity as Director of
Immigration and Customs Enforcement; LORI SCIALABBA, in Her Official
Capacity as Acting Director of United States Citizenship and Immigration
Services,

Defendants–Appellees/Cross-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

**BRIEF FOR THE FEDERAL APPELLEES/CROSS-APPELLANTS**

STUART F. DELERY
  Assistant Attorney General
SARAH R. SALDAÑA
  United States Attorney
MICHAEL JAY SINGER
  (202) 514-5432
JEFFREY CLAIR
  (202) 514-4028
  jeffrey.clair@usdoj.gov

Attorneys, Civil Division
Room 7243, Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

**STATEMENT REGARDING ORAL ARGUMENT**

The Secretary of Homeland Security and other federal appellants/cross-appellees respectfully request oral argument. Oral argument will illuminate the position of the parties and aid the Court in reaching a decision.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT……………………….. i

STATEMENT OF JURISDICTION ..................................................................... 2

STATEMENT OF THE ISSUES PRESENTED
    FOR REVIEW............................................................................................ 4

STATEMENT OF THE CASE.......................................................................... 5

    1.     Statutory Scheme: Immigration Enforcement
         and Prosecutorial Discretion ............................................................ 5

    2.     District Court Proceedings and Decision...................................... 17

         a.     Standing.................................................................................... 18

         b.     Merits ........................................................................................ 21

         c.     Subject Matter Jurisdiction .................................................. 23

SUMMARY OF THE ARGUMENT................................................................ 24

STANDARD OF REVIEW ............................................................................. 29

ARGUMENT...................................................................................................... 30

    I.     The State of Mississippi Lacks Standing To
         Challenge The Secretary's Exercise Of
         Prosecutorial Discretion In Removal
         Proceedings ........................................................................................ 30

A. Mississippi's Alleged Injuries Would Not Be Redressed By A Favorable Decision On Its Statutory Claims ...................................... 32

B. Mississippi Has Not Alleged Or Established A Concrete Injury Traceable To The Secretary's Exercise Of Prosecutorial Discretion .......................................................................... 34

1. *Massachusetts* v. *EPA* Does Not Relieve Mississippi Of The Obligation To Allege A Concrete Injury.......................................................................... 35

2. Prudential Considerations Weigh Against Standing Because The Claimed Injury Is Not Within The Zone Of Interests Protected By The Statutes Underlying Mississippi's Claim...................................................... 37

3. The District Court Reasonably Determined That Mississippi Had Not Established An Injury Sufficient To Support Standing ................................................. 39

4. Mississippi's Allegations Of Injury Are Too Conclusory, Speculative, And Indefinite To Support Standing ....................... 47

iii

II.   The Plaintiff Immigration Officers' Employment-Related
       Claims Are Not Ripe for Adjudication.......................................... 50

III.  The Civil Service Reform Act Precludes District
       Court Jurisdiction Over The Plaintiff Immigration
       Officers' Claims Of Employment-Related Injury ........................ 55

       A.   The CSRA Establishes A Comprehensive
            Remedial Scheme For Resolving Federal
            Employment Disputes............................................................ 55

       B.   CSRA Remedies Are Exclusive And Bar
            District Court Jurisdiction Over Claims
            Arising Out Of A Federal Employment
            Dispute..................................................................................... 59

       C.   The CSRA Precludes Plaintiffs' Claim
            For Prospective Injunctive Relief........................................ 62

       D.   Statutory And Constitutional Claims Are
            Not Excepted From The CSRA's Exclusive
            Remedial Scheme ................................................................... 67

IV.   *Leedom* v. *Kyne* Does Not Authorize Plaintiffs To
       Circumvent The Jurisdictional Limitations Of The
       Civil Service Reform Act ................................................................. 70

V.    The Immigration Statutes Do Not Limit The
       Secretary's Prosecutorial Discretion To Defer
       Enforcement Action ......................................................................... 79

CONCLUSION ............................................................................................. 90

FRAP 32(a)(7) CERTIFICATE OF COMPLIANCE ....................................... 91

CERTIFICATE OF SERVICE ..................................................................... 91

**Cases:**

*Abbott Labs. v. Gardner*, 387 U.S. 136. (1967)............................... 50, 51

*AFGE Local I v. Stone*, 502 F.3d 1027 (9th Cir. 2007) ..................................... 65

*Ali v. Rumsfeld*, 649 F.3d 742 (D.C. Cir. 2011) .................................................. 18

*Allen v. Wright*, 468 U.S. 737 (1984)................................................................. 31, 78

*Am. States Ins. Co. v. Bailey*, 133 F.3d 363 (5th Cir. 1998) ............................. 29

*American Airlines, Inc. v. Herman*, 176 F.3d 283
        (5th Cir. 1999) ........................................................................................... 72

*American Bottom Conservancy v. U.S. Army Corps of
        Engineers*, 650 F.3d 652 (7th Cir. 2011) .................................................... 79

*Arizona v. United States*, 132 S. Ct. 2492 (2012) ....................................... 9, 36, 75

*Arvie v. Broussard*, 42 F.3d 249 (5th Cir. 1994) ................................................ 79

*Baker v. Carr*, 369 U.S. 186 (1962)................................................................. 30

*Bennett v. Spear*, 520 U.S. 154 (1997)................................................................. 37

*Board of Governors of the Federal Reserve System v.
        MCorp Financial, Inc.*, 502 U.S. 32 (1991) ......................................... 27, 72

*Boire v. Greyhound Corp.*, 376 U.S. 473 (1964)....................................................... 71

*Broadway v. Block*, 694 F.2d 979 (5th Cir. 1982).................................................... 64

*Brotherhood of Ry. & S.S. Clerks v. Association for the
Benefit of Non-Contract Employees*, 380 U.S. 650 (1965) ..................... 64, 71

*Carducci v. Regan*, 714 F.2d 171 (D.C. Cir.  1983)............................................ 56

*Cent. & Sw. Servs. v. EPA*, 220 F.3d 683 (5th Cir. 2000) ................................. 51

*Chamber of Commerce of the United States v. Whiting*,
131 S. Ct. 1968 (2011) ....................................................................................5

*Commonwealth of Pennsylvania v. Kleppe*,
533 F.2d 668 (D.C. Cir. 1976) ............................................................. 36, 49

*Compensation Dep't v. Marshall*, 667 F.2d 336 (3d Cir. 1981)......................... 72

*Cornelius v. Nutt*, 472 U.S. 648 (1985)................................................................. 58

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988)......................................... 72

*Donelon v. La. Div. of Adm. Law ex rel. Wise*,
522 F3d 564 (5th Cir. 2008)................................................................. 20, 52

*Dubois v. Thomas*, 820 F.2d 943 (8th Cir. 1987)................................................. 84

*Dunlop v. Bachowski*, 421 U.S. 560 (1975) .......................................................... 81

*Elgin v. Dept. of the Treasury*, 132 S. Ct. 2126
(2012)................................................................. 3, 26, 55, 61, 65, 66, 67, 69

*Finch v. Mississippi State Med. Ass'n*,
  585 F.2d 765 (5th Cir. 1978)................................................. 20, 52

*Galvin v. FDIC*, 48 F.3d 531, 1995 WL 84520
 (5th Cir. 1995) ............................................................................. 64

*Gandy Nursery, Inc. v. United States*, 318 F.3d 631
  (5th Cir. 2003) ......................................................................... 30, 43

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907)....................................... 35

*Graham v. Ashcroft*, 358 F.3d 931 (D.C. Cir. 2004)................................ 61-62, 64

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................................. 79, 80, 88

*Hertz Corp. v. Friend*, 559 U.S. 77 (2010)............................................................ 41

*Heslabeck v. United States*, 821 F. Supp. 404
  (E.D. N.C. 1993) ..................................................................................... 65

*In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) ............................... 30, 43

*In re G-N-C*, 22 I. & N. Dec. 281 (B.I.A. 1998) ........................................... 33

*Kirby Corp. v. Pena*, 109 F.3d 258 (5th Cir. 1997)................................. 27, 71, 72

*Leedom v. Kyne*, 358 U.S. 184
  (1958)..................................... 4, 24, 26, 27, 70, 71, 72, 73, 74, 75, 76, 77, 78

*Lexmark International, Inc. v. Static Control
  Components, Inc.*, 134 S. Ct. 1377 (2014)............................................. 37, 38

*Linn v. Chivatero*, 714 F.2d 1278 (5th Cir. 1983) ................................................ 3

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)................... 25, 31, 32, 38, 39

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987) ................................. 77

*Mangano v. United States*, 529 F.3d 1243 (9th Cir. 2008) .......................... 62, 64

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................. 34, 35, 47

*Mathews v. Diaz*, 425 U.S. 57 (1976) .................................................................. 36

*Matter of Vizcarra-Delgadillo*, 13 I & N Dec. 51
 (BIA 1968) ...................................................................................................... 10

*Martin* v. *DHS*, 2014 WL 1900939 (MSPB May 9, 2014) ........................... 74-75

*McAuliffe v. Rice*, 966 F.2d 979 (5th Cir. 1992) ............................... 61, 64, 66, 67

*McLendon v. Jackson Television, Inc.*, 603 F.3d 1174
 (5th Cir. 1979) .................................................................................................. 72

*Nor-Am Agricultural Products, Inc. v. Hardin*,
 435 F.2d 1151 (7th Cir. 1970) .......................................................................... 72

*NTEU v. Devine*, 577 F. Supp. 738 (D.D.C. 1983) .......................................... 66

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
 523 U.S. 726 (1998) ..................................................................................... 51, 54

*Paladin Community Mental Health Center v. Sebelius*,
 684 F.3d 527 (5th Cir. 2012) ........................................................................... 72

*People of Colorado ex rel. Suthers v. Gonzales*,
 558 F. Supp. 2d 1158 (D. Colo. 2007) ........................................................... 35

*Pinar v. Dole*, 747 F.2d 899 (4th Cir. 1984) ...................................................... 64

*Quivira Mining Co. v. EPA*, 728 F.2d 477 (10th Cir. 1984) ............................ 72

*Reno v. American Arab Anti-Discrimination Committee*,
     525 U.S. 471 (1999) ................................................. 8, 28, 50, 75, 88

*Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43 ...................................... 50

*Resolution Trust Corp. v. Miramon*, 22 F.3d 1357
     (5th Cir. 1994) ...................................................................... 29

*Sampson v. Murray*, 415 U.S. 61 (1974) ....................................... 54, 63

*Schlesinger v. Reservists Comm. to Stop the War*,
     418 U.S. 208 (1974) ............................................................ 47, 69

*Seabrook v. Costle*, 659 F.2d 1371 (5th Cir. 1981) ......................... 28, 84

*Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) .............. 77

*Simon v. Eastern Ky. Welfare Rights Organization*,
     426 U.S. 26 (1976) .................................................................. 32

*Siwe v. Holder*, 742 F.3d 603 (5th Cir. 2014) .................................... 88

*Skelly Oil Co. v. Phillips Petroleum Co.*,
     339 U.S. 667 (1950) ................................................................ 18

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) .................................. 88

*Smith v. Department of the Army*, 458 F.3d 1359
     (Fed. Cir. 2006) ..................................................................... 56

*Telecommunications Research and Action Center v. FCC,*
750 F.2d 70 (D.C. Cir. 1984) ........................................................................ 72

*Texas v. United States*, 106 F.3d 661 (5th Cir. 1997) ......................................... 37

*Towers v. Horner*, 791 F.2d 1244 (5th Cir. 1986) ............................................... 64

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005)...................................... 84

*U.S. Dept. of the Treasury v. FLRA,*
43 F.3d 682 (D.C. Cir. 1994) ........................................................................ 59

*United Food & Commercial Workers Int. Union v. IPB, Inc.,*
857 F.2d 422 (8th Cir. 1988)......................................................................... 52

*United States v. Fausto*, 484 U.S. 439
(1988).................................................... 3, 26, 55, 59, 61, 63, 64, 65, 66, 69,

*United States v. Wallace & Tiernan Co.,*
336 U.S. 793 (1949) ........................................................................................ 3

*Valley Forge Christian College v. Americans United for*
*Separation of Church and State, Inc.*, 454 U.S. 464 (1982) ........................ 30

*Warth v. Seldin*, 422 U.S. 490 (1975)....................................................... 37, 40, 47

*Weaver v. Texas Capital Bank N.A.,*
660 F.3d 900 (5th Cir. 2011)......................................................................... 79

*Whitman v. Dep't of Transportation*, 547 U.S. 512 (2006) ................................ 64

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981).............................. 40, 42, 43

*Wood v. Herman*, 104 F. Supp. 2d 43 (D.D.C. 2000)......................................... 84

*Wyoming v. U.S. Dept. of Interior*, 674 F.3d 1220
    (10th Cir. 2012) ................................................................................................. 49

**United States Constitution:**

Article III ...................................................... 20, 25, 37, 50, 52, 57, 65, 78

**Statutes:**

Administrative Procedure Act:

5 U.S.C. § 701(a)(1) ............................................................................ 18
5 U.S.C. § 701(a)(2) ............................................................................ 18
5 U.S.C. § 706(2) ................................................................................. 18

Civil Service Reform Act:

5 U.S.C. § 1101, et seq. ................................................................. 8, 55
5 U.S.C. § 1214(a)(1) .......................................................................... 62
5 U.S.C. § 1214(a)(3) .......................................................................... 57
5 U.S.C. § 1214(b)(2) .......................................................................... 62
5 U.S.C. § 1214(c)(1) .......................................................................... 57
5 U.S.C. § 1221(a) ............................................................................... 57
5 U.S.C. § 1221(g)(1)(A) ..................................................................... 74
5 U.S.C. § 1221(h) .............................................................................. 57
5 U.S.C. §  2302(b)(9)(D) ............................................................ 57, 73
5 U.S.C. § 7103(a)(9)(A) ..................................................................... 58
5 U.S.C. § 7103(a)(9)(C)(ii) ................................................................ 58
5 U.S.C. § 7121 ................................................................................... 58
5 U.S.C. § 7121(b)(1)(C)(iii) ............................................................... 64

5 U.S.C. § 7122 ...................................................................... 58

5 U.S.C. § 7122(a)................................................................. 58

5 U.S.C. § 7123 ...................................................................... 58

5 U.S.C. § 7123(a)(1) ............................................................ 59

5 U.S.C. § 7703 ...................................................................... 57

5 U.S.C. § 7703(b) ................................................................ 57

5 U.S.C. § 7703(b)(1).............................................................. 57

6 U.S.C. § 202(5)............................................................. 11, 89

Declaratory Judgment Act:

    28 U.S.C. §§ 2201 & 2202 ...................................................... 18

Illegal Immigration Reform and Immigrant
    Responsibility Act, Pub. L. No. 104–208,
    Div. C. Title III, 301 & 302,
    110 Stat. 3009-575-584 (1996) ............................................... 87

Immigration and Nationality Act, 66 Stat. 163,
    as amended, 8 U.S.C. § 1101 et seq. ...................................... 5

8 U.S.C. § 1103 ................................................................. 6, 89

8 U.S.C. § 1103(g) ................................................................... 7

8 U.S.C. § 1129a(c)(3) ............................................................ 87

8 U.S.C. § 1182(a)................................................................... 6

8 U.S.C. § 1182(a)(2) & (3) .................................................... 6

8 U.S.C. § 1182(a)(6) & (7) .................................................... 6

8 U.S.C. § 1225 ...................................................................... 86

8 U.S.C. § 1225(a)(1)........................................ 17, 22, 32, 38, 81, 82

8 U.S.C. § 1225(b)(2)................................................... 22, 38

8 U.S.C. § 1225(b)(1)(A)(i) .................................................... 7

8 U.S.C. § 1225(b)(1)(A)(iii).................................................. 7

8 U.S.C. § 1225(b)(2)(A) ....................... 4, 17, 22, 27, 81, 82, 85

8 U.S.C. § 1227 ...................................................................... 6

8 U.S.C. § 1227(a)(1)(A) ...................................................... 6

8 U.S.C. § 1227(a)(1)(C) ...................................................... 6

8 U.S.C. § 1227(a)(2) ........................................................... 6

8 U.S.C. § 1227(a)(4) ........................................................... 6

8 U.S.C. § 1228(b) ............................................................... 7

8 U.S.C. § 1229a .......................................................... 7, 22, 28

8 U.S.C. § 1229(a)(1) ........................................................... 8

8 U.S.C. § 1229a(a) .............................................................. 7

8 U.S.C. § 1229a(a)(3) .......................................................... 7

8 U.S.C.  § 1229a(b) ............................................................ 8

8 U.S.C. § 1229a(c)(2) ......................................................... 87

8 U.S.C. § 1229(c) ............................................................... 8

8 U.S.C. § 1252(a) .............................................................. 13


28 U.S.C. § 1291 .................................................................. 3

28 U.S.C. § 1331 .................................................................. 7

## Rules:

Fed. R. App. P. 43(c)(2) ........................................................ 6

Fed. R. Civ. P. 12(b)(1) ....................................................... 40

Fed. R. Civ. P. 59(e) ............................................................ 3

## Regulations:

8 C.F.R. 239.1(a) ............................................................. 8, 11

8 C.F.R. 239.2(a) ........................................................... 32, 33

8 C.F.R. 239.2 (a)(6) & (7) .................................................. 16

8 C.F.R. 239.2(c) ........................................................... 17, 39

8 C.F.R. 274a.12(c)(14) ...................................................... 16

8 C.F.R. 1003.10 ................................................................ 7

8 C.F.R. 1003.12-1003.37 ..................................................... 8

8 C.F.R. 1003.14 ................................................................ 7

8 C.F.R. 1003.38 ................................................................ 8

8 C.F.R. 1239.1(a) ............................................................. 8

8 C.F.R. 1239.2(c) ...................................................... 11, 33

**Legislative Materials:**

H. Rep. No. 104-469, Pt. 1, 104th Cong.,
    2d Sess. 225-26 (1996) ............................................. 87

H. Rep. No. 111-157, 111th Cong., 1st Sess.  8 (2009) .................................. 89

S. Rep. No. 969, 95th Cong., 2d Sess. 3 (1978) ................................. 59

**Miscellaneous:**

National Institute of Corrections,
  State Statistics, http://nicic.gov/statestats/?st=MS ................................... 45

*Webster's Third New International Dictionary*
    at 2055 (1993) ................................................... 82

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————————

No. 14-10049

————————————

CHRISTOPHER L. CRANE, et al.,

Plaintiffs-Appellants/Cross-Appellees,

v.

JEH JOHNSON, SECRETARY OF
HOMELAND SECURITY, et al.,[1]

Defendants-Appellees/Cross-Appellants.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

————————————

**BRIEF FOR THE FEDERAL APPELLEES/CROSS-APPELLANTS**
————————————

Plaintiffs are federal immigration officers and the state of Mississippi.

They challenge a Department of Homeland Security policy to defer taking

---

[1] Pursuant to FRAP 43(c)(2), Secretary Johnson is automatically
substituted as defendant-appellee/cross-appellant.

enforcement action against aliens who, though unlawfully present in the

United States, arrived in the United States as children and meet certain

other criteria, such as having served in the United States armed forces.

Plaintiffs allege that this prosecutorial discretion policy is inconsistent with

statutory provisions assertedly compelling federal immigration officers to

initiate removal proceedings against *all* inadmissible aliens, regardless of

humanitarian considerations, resource constraints, or the alien's prior

contributions to the interests of the United States.  They accordingly seek a

declaratory judgment that the policy is invalid and an injunction barring

the government from exercising its prosecutorial discretion to refrain from

initiating removal proceedings.

## STATEMENT OF JURISDICTION

1.   Plaintiffs alleged district court jurisdiction under 28 U.S.C. § 1331.

ROA.106.  As explained more fully below, however, the district court

correctly dismissed the case for lack of subject matter jurisdiction.

Plaintiffs lack standing to assert a generalized grievance as to the

government's exercise of prosecutorial discretion in the enforcement of

federal immigration law.  And insofar as the plaintiff immigration officers

challenge the potential imposition of employee discipline for failure to

follow agency enforcement policy, district court jurisdiction is barred by

principles of ripeness as well as the Civil Service Reform Act, 5 U.S.C. §

1101, *et seq.  See Elgin* v. *Dept. of the Treasury*, 132 S. Ct. 2126  (2012); *United*

*States* v. *Fausto*, 484 U.S. 439, 455 (1988).

2.  The district court entered a final judgment dismissing the case for

lack of jurisdiction on July 31, 2013.[2]  ROA.1360.  Plaintiffs filed a timely

FRCP 59(e) motion to alter or amend the judgment on August 28, 2013,

which the court denied by order entered December 9, 2013.  ROA.1418.

Plaintiffs filed a timely notice of appeal on January 8, 2014.  ROA.1430.  The

federal defendants filed a timely cross-appeal on January 17, 2014.

ROA.1433.  This Court has appellate jurisdiction under 28 U.S.C. §1291.

---

[2] Although the court stated that its dismissal was "without prejudice," the order disposes of all the claims of all the parties, terminates the litigation, and does not contemplate any further proceedings in district court.  It is therefore final and amenable to appellate review.  *See United States* v. *Wallace & Tiernan Co.*, 336 U.S. 793, 794 n.1 (1949); *Linn* v. *Chivatero*, 714 F.2d 1278, 1280 (5th Cir. 1983).

# STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Whether the state of Mississippi has standing to challenge the Department of Homeland Security's discretionary policy of declining to commence removal proceedings against certain inadmissible aliens who arrived in the United States as children.

2.  Whether the plaintiff immigration officers' claim for equitable relief against potential future disciplinary action is ripe for adjudication.

3.  Whether the Civil Service Reform Act precludes the district court from assuming subject matter jurisdiction over the plaintiff immigration officers' claims that they will be subject to unlawful employment discipline if they fail to comply with DHS policy.

4.  Whether, notwithstanding the remedies afforded by the Civil Service Reform Act, district court jurisdiction is authorized under *Leedom* v. *Kyne*, 358 U.S. 184 (1958).

5.  Whether 8 U.S.C. § 1225(b)(2)(A), which provides that all inadmissible applicants seeking admission to the United States "shall be

detained" for removal proceedings bars DHS from exercising its prosecutorial discretion to refrain from initiating removal proceedings against inadmissible aliens where the Department concludes that humanitarian considerations, resource limitations, or other factors warrant deferring enforcement action.

## STATEMENT OF THE CASE

1. <u>Statutory Scheme:  Immigration Enforcement and Prosecutorial Discretion</u>.

**a.**  The Immigration and Nationality Act, 66 Stat. 163, as amended, 8 U.S.C. §§ 1101 *et seq.*, "established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country."  *Chamber of Commerce of the United States* v. *Whiting*, 131 S. Ct. 1968, 1973 (2011) (internal quotations and citation omitted).  Much of the authority to enforce the immigration laws and to

establish enforcement priorities is now vested in the Secretary of

Homeland Security.  8 U.S.C. § 1103; 6 U.S.C. § 202(5).

The statute sets forth a range of grounds on which an alien may be

removed from the United States.  *See generally* 8 U.S.C. §§ 1227(a), 1182(a).

Aliens who have been convicted of certain crimes or who have engaged in

criminal activity that endangers public safety or national security are

removable.  8 U.S.C. §§ 1227(a)(2) & (4); 8 U.S.C. § 1182(a)(2) & (3).  Aliens

may also be removed for less serious infractions.  For example, aliens are

removable if they remain in the country beyond their authorized period of

stay or violate conditions imposed on their admission.  8 U.S.C. §

1227(a)(1)(C).  Similarly, aliens may be removed if they lacked an

appropriate visa or were inadmissible on other, non-criminal grounds

when they entered the United States.  *See* 8 U.S.C. § 1227(a)(1)(A) & (C); 8

U.S.C. § 1182(a)(6) & (7).

An administrative determination to remove an alien from the United

States is generally made through proceedings conducted in immigration

court – a specialized tribunal within the Department of Justice.  8 U.S.C. § 1229(a)(1), § 1103(g); 8 C.F.R. 1003.10.   With limited exceptions not relevant here, these immigration court proceedings are the "sole and exclusive procedure for determining whether an alien may be * * * removed from the United States."  8 U.S.C. § 1229a(a)3).[3]

Removal proceedings conducted under 8 U.S.C. § 1229a are commenced by filing a "notice to appear" with the immigration court. 8  U.S.C. § 1229(a); 8 C.F.R. 1003.14.  The notice must be in writing and, among other requirements, must describe the nature of the proceedings, their legal basis, and the acts or conduct alleged to be in violation of the law.  8 U.S.C. §  1229(a)(1).  The notice must be served on the alien in person unless personal service is impractical, in which case service may be

---

[3] Other, more expedited proceedings may, for example, be employed to remove inadmissible aliens arriving in the United States  (8 U.S.C. § 1225(b)(1)(A)(i)), certain aliens who were not lawfully admitted or paroled into the United States and who were not continuously present in the United States for the two-year period immediately prior to their inspection (8 U.S.C. § 1225(b)(1)(A)(iii)), and aliens convicted of aggravated felonies (8 U.S.C. § 1228(b)).

effected by mail.  8 U.S.C. § 1229(a)(1) & (c).  Authority to issue a "notice to appear" and to thereby commence removal proceedings is generally vested in supervisory immigration officials.  8 C.F.R. 239.1(a); 8 C.F.R. 1239.1(a).

Once proceedings are initiated, removability and the availability of any relief or protection from removal are determined by an immigration judge after an evidentiary hearing.  8 U.S.C. 1229a(b); 8 C.F.R. 1003.12-1003.37.  The immigration judge's decision may be administratively appealed to the Board of Immigration Appeals.  8 C.F.R. 1003.38.   The Board's final order of removal may, in some instances, then be reviewed by filing a petition in the appropriate court of appeals.  8 U.S.C. § 1252(a).

**b.**  Immigration officials have broad prosecutorial discretion to refrain from proceeding against otherwise removable aliens.  In *Reno* v. *American Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999), the Supreme Court stated that "[a]t each stage [of the deportation process] the Executive has discretion to abandon the endeavor" and noted that immigration officials "had been engaging in a regular practice (which has

come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."  The Court recently confirmed that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials."  *Arizona* v. *United States*, 132 S. Ct. 2492, 2499 (2012).  It stated that the exercise of enforcement discretion may turn on the equities of an individual case, such as "whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service" or may instead involve policy choices that bear on the nation's international relations.  *Ibid*.  The Court concluded that "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Ibid*.

The exercise of prosecutorial discretion in determining whether to seek removal of an alien is a longstanding agency practice.  In a 1976 legal opinion, the General Counsel of the Immigration and Naturalization Service concluded that there was an established administrative practice of exercising prosecutorial discretion in the enforcement of the immigration

laws, and that such discretion is inherent in the agency enforcement function and thus does not depend on any specific statutory authorization. *See* Legal Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1975), ROA.440, citing, among other precedent, *Matter of Vizcarra-Delgadillo*, 13 I & N Dec. 51, 53 (BIA 1968). The legal opinion notes that courts had acknowledged that the decision whether to seek deportation normally lies within the sound discretion of the officer having responsibility for the case. ROA.441. It concludes that:

> Normally, the appropriate time for the exercise of prosecutorial discretion is prior to the institution of proceedings. The primary reason for this is the humanitarian factor; it makes little sense to put the alien through the ordeal and expense of a deportation proceeding when his actual removal will not be sought. In addition, there are practical considerations. Deportation proceedings tie up Government manpower and resources that could be used in performing other important functions. Given the present illegal alien problem[,] such a use of scarce resources on aliens whom the [INS] does not ultimately intend to deport is indefensible.

ROA.442.

Applicable regulations continue to expressly recognize this discretionary authority. They provide that appropriate officials may issue

a notice to appear but do not mandate commencement of proceedings against every removable alien. 8 C.F.R. 239.1(a). Moreover, they provide that any officer authorized to issue a notice to appear may cancel it at any time prior to jurisdiction vesting in the immigration court if it appears that the notice was "improvidently issued" or that "changed circumstances" indicate that continuation of removal proceedings is "no longer in the best interest of the government." 8 C.F.R. 239.2 (a)(6) & (7). After jurisdiction vests in the immigration court, which, as noted, is a component of the Executive Branch, government counsel or any official authorized to issue the notice to appear may move to dismiss removal proceedings on the same grounds. 8 C.F.R. 239.2(c); 8 C.F.R. 1239.2(c).

**c**. On June 17, 2011, the Director of the U.S. Immigration and Customs and Enforcement ("ICE") issued an internal memorandum clarifying the agency's general policies on the exercise of prosecutorial discretion. ROA.425. The memorandum, noting that the agency has limited resources to remove illegal aliens, states that ICE must "prioritize

the use of its enforcement personnel, detention space, and removal assets to ensure that the aliens it removes represent, as much as reasonably possible, the agency's enforcement priorities, namely the promotion of national security, border security, public safety, and the integrity of the immigration system." ROA.426.

The memorandum makes several points relevant here. First, the memorandum reiterates that ICE may exercise its prosecutorial discretion at any stage of removal proceedings, ranging from the initial decision to commence removal proceedings through execution of a final removal order. ROA.426-427.

Second, the memorandum identifies the various agency officers who have authority to exercise prosecutorial discretion, noting that prosecutorial discretion extends to officers or agents who have authority to institute removal proceedings, and that all exercises of prosecutorial discretion are subject to appropriate supervisory oversight. ROA.427.

Third, the memorandum identifies a range of positive and negative factors that may be taken into account in determining whether to exercise the discretion to refrain from seeking removal of a removable alien.  These include whether the alien arrived in the United States as a young child, service in the military, pursuit of education within the United States, the alien's age, with particular consideration given to minors and the elderly, length of presence in the United States, and ties -- or the lack of such ties -- to the country of origin.  ROA.428-429.

Fourth, the memorandum stresses that although the exercise of prosecutorial discretion should always be considered on a case-by-case basis, "there are certain classes of aliens that warrant particular care." ROA.429.  These classes include: minors and elderly individuals, individuals present in the United States since childhood, pregnant or nursing women, individuals with serious health conditions, and veterans or members of the U.S. armed forces.  *Ibid*.

Finally, the memorandum states that an alien has no right to the exercise of prosecutorial discretion, that ICE retains legal authority to remove any alien unlawfully in the United States, and that the decision to refrain from prosecuting removal proceedings is an exercise of administrative discretion that does not create any legal right or confer any irrevocable benefit. ROA.430.

**d.** On June 15, 2012, the Secretary of Homeland Security issued a memorandum specifically addressing the exercise of prosecutorial discretion in the enforcement of immigration laws against "young people who were brought to this country as children and know only this country as a home." ROA.432. The Secretary stated that:

> Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

ROA.433.

The memorandum outlines a discretionary enforcement policy referred to as Deferred Action for Childhood Arrivals or "DACA."  It thus provides that immigration officials may consider, on a case-by-case basis, refraining from prosecuting removal actions against aliens who:  (1) were under the age of sixteen when they came to the United States, (2) were present in the United States on the June 2012 effective date of the memorandum and have continuously resided in the U.S. for at least five years preceding the effective date of the memorandum, (3) are in school or have completed high school level education or have been honorably discharged from the Coast Guard or United States armed services, (4) have not been convicted of significant criminal offenses and do not otherwise pose a threat to public safety or national security, and (5) are not above the age of 30.  ROA.432.

Aliens who meet these criteria may receive several types of relief. First, officials "should immediately exercise their discretion, on an

individual basis" to refrain from commencing removal proceedings in the first instance. ROA.433.

Second, if removal proceedings have already been commenced, immigration officials should consider deferring further enforcement action for two years, subject to renewal, "to prevent low priority individuals from being removed from the United States." *Ibid*.

Third, if such deferred action is granted, the alien may apply for work authorization during the period for which deferred action has been authorized. ROA.434; *see* 8 C.F.R. 274a.12(c)(14) (permitting aliens authorized for deferred action to apply for employment authorization).

Fourth, the memorandum provides for establishment of an administrative process through which aliens can request deferred action, even if they are not in removal proceedings or are otherwise subject to active scrutiny of their immigration status – a step that would then permit them to apply for work authorization. ROA.433-434.

Finally, the memorandum states that it "confers no substantive right, immigration status or pathway to citizenship" but is intended "to set forth policy for the exercise of discretion within the framework of existing law." ROA.434. The Secretary thus retains discretion to institute enforcement action at any time.

2. <u>District Court Proceedings and Decision</u>.

Plaintiffs are the state of Mississippi and immigration officers employed by DHS's Immigration and Customs Enforcement agency. ROA.100. They allege that DHS's prosecutorial discretion memoranda are contrary to statutory provisions assertedly mandating commencement of removal proceedings against *all* inadmissible aliens who are seeking admission to the United States at a port of entry, or who are deemed to be applicants for admission by operation of law. ROA.114-117; s*ee* 8 U.S.C. §§ 1225(a)(1); 1225(b)(2)(A). Plaintiffs seek a declaratory judgment that the Secretary's prosecutorial discretion policy is unlawful, as well injunctive relief barring the Secretary from implementing the policy or from taking

any adverse employment action against the plaintiff immigration officers

for failing to follow it.[4]  ROA.122-123.

    a.  <u>Standing</u>.

The court, ruling on the government's motion to dismiss, concluded

that, while plaintiffs do not have standing to press a generalized grievance

against the Secretary's enforcement policies, the plaintiff immigration

officers do have standing to assert a narrower range of claims related to

prospective, employment-related discipline.

The court thus held that Mississippi lacked standing and dismissed it

from the case.  ROA.884-888.  Mississippi had alleged that the prosecutorial

---

[4] Plaintiffs' complaint implies that their cause of action to seek such relief is based on the Declaratory Judgment Act, 28 U.S.C. § § 2201 & 2202, and the Administrative Procedure Act, 5 U.S.C. 706(2).  ROA.122-123.  The Declaratory Judgment Act, however, does not afford an independent cause of action or basis for subject matter jurisdiction.  *Ali* v. *Rumsfeld*, 649 F.3d 742, 778 (D.C. Cir. 2011), citing *Skelly Oil Co.* v. *Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).  And while the APA provides a cause of action to challenge unlawful agency action, it does not apply where statutes preclude judicial review (5 U.S.C. § 701(a)(1)) or where the challenged agency action is committed to agency discretion by law (5 U.S.C. § 701(a)(2)).

discretion policy would allow a significant number of otherwise removable aliens to remain within the State, and that the State would consequently incur additional health, education, and law enforcement costs.  The court concluded that "Mississippi's asserted fiscal injury is purely speculative because there is no concrete evidence that the costs associated with the presence of illegal aliens in the state of Mississippi have increased or will increase as a result of" the DHS policy.  ROA.888.

The court similarly concluded that the plaintiff immigration officers do not have standing insofar as they assert a generalized interest in official compliance with the immigration law.  ROA.868-874.  Plaintiffs argued that they had taken an oath to uphold federal law, that DHS policy required them to violate federal law by instructing them to refrain from commencing removal proceedings in circumstances where, in plaintiffs' view, federal law mandates commencement of removal proceedings, and that the resulting, compelled violation of their oath of office is an injury sufficient to support standing.  The district court rejected these contentions,

concluding that, under this Court's precedents, a plaintiff lacks standing if the only consequence that flows from adhering to a challenged policy would be a perceived violation of the plaintiff's oath of office. ROA.869-872, citing *Donelon* v. *La. Div. of Adm. Law ex rel. Wise*, 522 F3d 564 (5th Cir. 2008) and *Finch* v. *Mississippi State Med. Ass'n*, 585 F.2d 765 (5th Cir. 1978).

The court, however, concluded that the plaintiff immigration officers do have standing insofar as they face potential employment-related disciplinary action for failing to comply with the Secretary's prosecutorial discretion policies. ROA.874-878. It reasoned that an adverse employment action constitutes an injury-in-fact for purposes of Article III, and that although plaintiffs had not been subject to employment discipline thus far, the threat of adverse employment actions here is sufficiently concrete to render employment-related claims justiciable. ROA.875-877; *see also* ROA.954-955.

20

b. <u>Merits</u>

On April 23, 2013, the court issued a partial decision on plaintiffs' request for a preliminary injunction, concluding that plaintiffs had established a likelihood of success on the merits but postponing a final ruling on whether to issue a preliminary injunction pending further briefing on whether subject matter jurisdiction is precluded by the Civil Service Reform Act.   ROA.928-965.

The court acknowledged that the immigration laws vest the United States with the discretion to suspend removal proceedings after they are initiated.  It nonetheless concluded that applicable immigration statutes mandate the commencement of removal proceedings in all cases, even though the government has no obligation to prosecute the proceedings to conclusion and may terminate them at any time.   ROA.937.

This determination turns on the court's construction of two, inter-related statutory provisions: 8 U.S.C. § 1225(a)(1) and 8 U.S.C. § 1225(b)(2).[5] Section 1225(a)(1) provides that:

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

Section 1225(b)(2)(A) provides, subject to exceptions not relevant here, that:

> [I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding under section 1229a of this title.

The court reasoned that the use of the term "shall" in these statutes indicates that Congress intended to circumscribe the government's discretion and to mandate commencement of removal proceedings against

---

[5] Pertinent statutes and regulations are reprinted in the addendum to this brief.

22

aliens who are physically present within the United States, who gained

entry without being lawfully admitted, and who are not "clearly and

beyond a doubt" entitled to be admitted.  ROA.940-944.

    c. <u>Subject Matter Jurisdiction</u>

The district court subsequently concluded that the Civil Service

Reform Act bars subject matter jurisdiction over plaintiffs' employment-

related claims and dismissed all remaining claims for lack of subject matter

jurisdiction.   ROA.1353-1360.  The court observed that the CSRA

establishes a comprehensive and exclusive system for reviewing personnel

action taken against federal employees, and that the statute therefore

precludes employees from seeking redress in federal district court for

work-related controversies.  ROA.1356-1357.  It reasoned that because the

plaintiff immigration officers' claims are based on the threat of allegedly

unlawful workplace disciplinary action, their claims fall within the

preclusive scope of the CSRA.   ROA.1357-1358.   It further reasoned that it

is unnecessary to determine whether the CSRA affords an adequate

remedy because whatever statutory remedies are available are the sole and

exclusive remedies intended by Congress. ROA.1358. The court

accordingly held that it lacked subject matter jurisdiction over plaintiffs'

employment-related claims and dismissed the case.

Ruling on plaintiffs' subsequent motion to alter or amend the

judgment, the court further concluded that it could not assume jurisdiction

under the principles established by *Leedom* v. *Kyne*, 358 U.S. 184 (1958).

ROA.1418-1429. It reasoned that *Leedom* is inapplicable where the

aggrieved party has a meaningful opportunity for judicial review, and that

the CSRA provides a remedy for the employment-related claims asserted

by the plaintiff immigration officers. ROA.1424-1428. It therefore denied

plaintiffs' motion to alter or amend the judgment and reaffirmed its prior

order dismissing the case for lack of subject matter jurisdiction. ROA.1429.

## SUMMARY OF THE ARGUMENT

1. The district court correctly dismissed the state of Mississippi's

claims for lack of standing. A State, like any other litigant, must

demonstrate a clear connection between the challenged action and a concrete and particularized injury, and also show that a favorable decision would be likely to afford redress. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 575 (1992). Mississippi's allegations, however, merely frame a generalized grievance as to how the federal government has chosen to enforce immigration laws against other parties. Moreover, because the statutes at issue here do not, even under plaintiffs' interpretation, bar the Secretary from suspending or terminating removal proceedings at later stages of the case, Mississippi cannot show that a favorable decision would redress the putative harm caused by the presence of inadmissible aliens within its borders. Mississippi's allegations thus do not state a redressable, concrete, and particularized injury-in-fact sufficient to support Article III standing.

2. Subject matter jurisdiction over the plaintiff immigration officer's employment-related claims is barred by constitutional principles of ripeness as well as by the Civil Service Reform Act.

a. Plaintiffs' have not yet incurred a cognizable, employment-related injury arising out of a dispute over the Secretary's policies on prosecutorial discretion.  Their concerns that such injuries might occur in the future do not present a specific controversy that is ripe for adjudication.

b. Moreover, even if these claims are deemed ripe, subject matter jurisdiction in the district court is barred by the Civil Service Reform Act. The CSRA establishes the exclusive remedy for *all* claims arising out of a federal personnel action, and it bars the district court from assuming jurisdiction over them.  *Elgin* v. *Dept. of Treasury*, 132 S. Ct. 2126  (2012); *United States* v. *Fausto*, 484 U.S. 439, 455 (1988).  The district court therefore correctly dismissed plaintiffs' employment-related claims for lack of subject matter jurisdiction.

3.  Plaintiffs err in asserting that, notwithstanding the Civil Service Reform Act, the district court may assume jurisdiction under principles established in *Leedom* v. *Kyne*.  *Leedom* jurisdiction is exceedingly narrow, available only in the case of manifestly *ultra vires* action, and only if there is

no alternative avenue of judicial review.  *Board of Governors of the Federal Reserve System* v. *MCorp Financial, Inc.*, 502 U.S. 32 (1991); *Kirby Corp.* v. *Pena*, 109 F.3d 258, 268-69 (5th Cir. 1997).  The Civil Service Reform Act provides a meaningful avenue of judicial review for employment-related injuries.  It therefore forecloses resort to *Leedom* jurisdiction here.

4.  Finally, even assuming the district court had jurisdiction, it erred in indicating that it would have ruled on the merits that Congress has limited the Secretary's enforcement discretion by mandating commencement of removal proceedings in any and all cases.  The court reasoned that 8 U.S.C. § 1225(b)(2)(A)  requires all inadmissible aliens to be detained for removal proceedings.  But the statutory duty to detain for removal proceedings applies, only to aliens who are "seeking admission" to the country.  It does not apply to aliens who have already gained entry, are found within the United States, and are taking no action to "seek" admission.

In any event, section 1225(b)(2)(A) would not displace the Secretary's prosecutorial discretion, even if it applied. This Court has held that, "while 'shall' is normally interpreted to impose a mandatory duty[,] * * * when duties within the traditional realm of prosecutorial discretion are involved, the courts have not found this maxim controlling." *Seabrook* v. *Costle*, 659 F.2d 1371, 1374 n.3 (5th Cir. 1981). In this case, the statute directs only that an alien "shall be detained for a [removal] proceeding." That language makes detention mandatory if a removal proceeding is instituted, but it does not displace the Secretary's longstanding and well-recognized discretion to decline to institute removal proceedings in the first instance.

The government has for decades exercised the prosecutorial discretion to refrain from instituting removal proceedings where humanitarian factors or resource constraints indicate that deferring enforcement action is consistent with the larger interests of the United States. *See Reno* v. *American Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999). The statutes on which the district court relied do not

28

circumscribe this longstanding administrative practice. Nor do they

otherwise constrain the Secretary's discretion to refrain from removing

aliens who came to the United States as children, who now have significant

ties to this country, and who pose no threat to public safety or national

security. Thus, if the Court concludes that the district court had

jurisdiction, it should direct the entry of judgment for the Secretary on the

alternative ground that the pertinent immigration statutes do not limit the

Secretary's prosecutorial discretion.

## STANDARD OF REVIEW

This appeal presents issues of subject matter jurisdiction,

justiciability, and statutory construction. These are all questions of law

subject to the Court's *de novo* review. *See Gandy Nursery, Inc.* v. *United

States*, 318 F.3d 631, 636 (5th Cir. 2003); *Am. States Ins. Co.* v. *Bailey*, 133

F.3d 363, 368 (5th Cir. 1998); *Resolution Trust Corp.* v. *Miramon*, 22 F.3d 1357,

1359 (5th Cir. 1994).

The appeal also challenges the factual underpinnings of the district court's dismissal for lack of standing. Those factual determinations must be sustained unless clearly erroneous. *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir. 2014).

**ARGUMENT**

I. The State of Mississippi Lacks Standing To Challenge The Secretary's Exercise Of Prosecutorial Discretion In Removal Proceedings.

To establish standing, a plaintiff must show that he has suffered "some actual or threatened injury" fairly traceable to the challenged conduct of the defendants that is likely to be redressed by a favorable decision. *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). The standing requirement is intended to ensure the parties have "such a stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends * * *." *Baker* v. *Carr*, 369 U.S. 186, 204 (1962).

An abstract, general disagreement with the manner in which the government is administering and interpreting immigration laws cannot satisfy these requirements. "[A]n injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 575 (1992) . The Supreme Court thus has "repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen* v. *Wright*, 468 U.S. 737, 754 (1984).

Mississippi alleges that the Secretary's enforcement policies would result in the continued presence of unauthorized aliens within its borders, thereby burdening the state with additional health, education, and law enforcement costs. The claimed injury, however, is not redressable by a favorable decision and lacks sufficient specificity to support standing.

A. <u>Mississippi's Alleged Injuries Would Not Be Redressed By A Favorable Decision On Its Statutory Claims</u>.

The "irreducible constitutional minimum of standing" requires the plaintiff to establish two elements in addition to a concrete injury-in-fact: there must be a causal connection between the injury and the conduct complained of, and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560-61 (quoting *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38, 43 (1976). Mississippi must thus show that, if it were to prevail on its claim that 8 U.S.C. §§ 1225(a)(1) and 1225(b)(2) require illegal aliens to be detained, they would ultimately be removed and no longer burden the State's health and welfare system.

These statutes, however, only apply to the *initial* decision as to whether to commence removal proceedings. They do not apply to any subsequent stage of removal proceedings and do not, *even under plaintiffs' interpretation*, constrain the Secretary's discretion to suspend or terminate

removal proceedings at a later stage of the case. As the district court

found:

> DHS's ability to exercise its discretion at later stages in the
> removal process by, for example, cancelling the Notice to
> Appear or moving to dismiss the removal proceedings, is not at
> issue in the present case, and nothing in this [court] Order
> limits DHS's discretion at later stages of the removal process.
> See 8 C.F.R. § 239.2(a) (providing for cancellation of a Notice to
> Appear prior to jurisdiction vesting with an immigration
> judge); id. § 239.2(c) (providing for a motion to dismiss removal
> proceedings after jurisdiction vests with an immigration judge);
> *In re G-N-C*, 22 I. & N. Dec. 281, 283–84 (B.I.A. 1998) (noting
> that, pursuant to 8 C.F.R. § 239.2(a), an immigration officer
> "authorized to issue a Notice to Appear has complete power to
> cancel such notice prior to jurisdiction vesting with the
> Immigration Judge").

ROA.951.

The upshot is that Mississippi's statutory claims, even if successful,

would only afford the basis for an order compelling *initiation* of removal

proceedings. They do not afford any basis for a judicial order barring a

discretionary termination of a removal proceeding at a later stage of the

case. A favorable decision on plaintiffs' statutory claims would not compel

the ultimate removal of any alien. And it consequently would not redress

33

the putative injury resulting from the presence of additional unlawful aliens within Mississippi's borders.  As Mississippi cannot satisfy the essential constitutional requirement of redressability, the Court should affirm the judgment dismissing Mississippi's claims without further inquiry.

B.  <u>Mississippi Has Not Alleged Or Established A Concrete Injury Traceable To The Secretary's Exercise Of Prosecutorial Discretion</u>.

Mississippi has also failed to adequately allege or otherwise establish the concrete injury-in-fact necessary to support standing.  It argues here that, under *Massachusetts* v. *EPA*, 549 U.S. 497 (2007), its claim of injury is entitled to "special solicitude."  That contention, however, overstates the narrow scope of the *Massachusetts* holding and overlooks additional prudential limitations on a federal court's jurisdiction.  It cannot overcome Mississippi's fundamental failure to allege a concrete and particularized injury-in-fact.

1. *Massachusetts* v. *EPA* Does Not Relieve Mississippi Of The Obligation To Allege A Concrete Injury.

In *Massachusetts* v. *EPA* , the state of Massachusetts challenged the EPA's determination not to conduct a rulemaking regulating greenhouse gases emitted by new motor vehicles. The Supreme Court majority held that the State's assertion of standing was entitled to "special solicitude." *Id*. at 520.

The Court, however, did not hold that constitutional standing requirements must be relaxed whenever a State is a plaintiff in federal court. Its holding is instead based on two, case-specific circumstances: the fact that Congress had accorded the States a procedural right to challenge the EPA's failure to conduct a rulemaking regulating greenhouse gas emissions, and Massachusetts' unique, sovereign interests in protecting lands within its dominion. *Id*. at 520; *see also Georgia* v. *Tennessee Copper Co.*, 206 U.S. 230, 237 (1907) (State's standing to sue supported by its "interest independent of and behind the titles of its citizens, in all the earth and air

within its domain"); *People of Colorado ex rel. Suthers* v. *Gonzales*, 558 F.

Supp. 2d 1158, 1162 (D. Colo. 2007).

None of those factors is present here.  Indeed, prudential

considerations point in the opposite direction.  Unlike the protection of

land within a State's borders, immigration policy is a matter of

overridingly federal concern.  The federal government has broad,

constitutionally-based powers over the subject of immigration and the

status of aliens.  *Arizona*, 132 S. Ct. at 2498.  "Immigration policy may affect

trade, investment, tourism, and diplomatic relations for the entire Nation,

as well as the perceptions and expectations of aliens in this country who

seek the full protection of its laws."  *Ibid*.   And "[i]t is fundamental that

foreign countries concerned about the status, safety, and security of their

nationals  in the United States must be able to confer and communicate

with one national sovereign, not the 50 separate States."  *Ibid*.   There are

indeed unique sovereign interests implicated by this case.  But they belong

to the federal government, not Mississippi.  *See Commonwealth of*

*Pennsylvania* v. *Kleppe*, 533 F.2d 668, 678 (D.C. Cir. 1976) ("[S]uits against the Federal Government raise an important argument against standing which is not relevant where other types of defendants are involved. That is because wherever there is a federal defendant, a degree of disruption of asserted federal powers at the hands of a plaintiff state is unavoidable"); *see also Mathews* v. *Diaz*, 425 U.S. 57, 81-82 (1976)("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"); *Texas* v. *United States*, 106 F.3d 661, 665 (5th Cir. 1997) (same).

2. <u>Prudential Considerations Weigh Against Standing Because The Claimed Injury Is Not Within The Zone Of Interests Protected By The Statutes Underlying Mississippi's Claim</u>.

In addition to the immutable requirements of Article III, the federal judiciary has adhered to a set of prudential principles "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Bennett* v. *Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth* v. *Seldin*,

422 U.S. 490, 498 (1975)).  One of those prudential limitations is the

requirement that a plaintiff contesting an agency action on statutory

grounds show, not merely an injury-in-fact, but that his grievance falls

within the "zone of interests" protected or regulated by the statutory

provisions invoked in the suit.[6]  *Ibid*.

Mississippi cannot satisfy this prudential limitation on jurisdiction.

The statutes underlying its claim, 8 U.S.C. §§ 1225(a)(1) and 1225(b)(2),

regulate removal procedure.  They do not apply to the States and they are

not intended to confer any particular benefit on the States.  Moreover,

because Mississippi's claim of standing is based on the indirect

---

[6] In *Lexmark International, Inc.* v. *Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the Supreme Court held that in some circumstances the "zone of interests" test is better understood as an inquiry into whether Congress intended to provide a particular type of plaintiff a cause of action, rather than a prudential limitation on standing.  *Lexmark*, however, addresses statutory causes of action rather than the general cause of action established by the Administrative Procedure Act.  And, in any event, it makes clear that the "zone of interests" test remains focused on whether the statute is intended to protect the class of persons encompassing the plaintiff from the harm that has occurred as a result of the alleged statutory violation.  *Id*. at 1388-89 & n.5.

consequences of the way in which the federal government applies the

immigration statutes to third parties, it has an especially heavy burden of

establishing an injury sufficient to support standing. *See Lujan*, 504 U.S. at

562 ("[W]hen the plaintiff is not himself the object of the government action

or inaction he challenges, standing is not precluded, but it is ordinarily

'substantially more difficult' to establish");

These prudential considerations belie Mississippi's contention that its

claim of injury must be assessed with "special solicitude." They instead

indicate that Mississippi's claims must be carefully examined to ensure that

the suit is based on a concrete and particularized injury, and not a desire to

employ the courts as forum for airing generalized grievances about federal

immigration policy.

3. <u>The District Court Reasonably Determined That Mississippi Had Not Established An Injury Sufficient To Support Standing.</u>

The district court held that (1) the plaintiff bears the burden of

establishing standing (ROA.885, citing *Lujan*, 504 U.S. at 561) and, (2)

"there is no concrete evidence that the costs associated with the presence of illegal aliens in the state of Mississippi have increased or will increase as a result of" the DHS policy. ROA. 888.

Mississippi challenges this latter holding on appeal, but it advances contradictory assertions with respect to the analytical framework governing appropriate disposition of the Secretary's motion to dismiss. On the one hand, it argues that, at the pleading stage, the allegations of its complaint must be taken as true. It thus implies that the district court erred in looking beyond the face of the complaint and considering evidence of injury. *See* Appellant Br. at 11, 18, citing *Warth*, 422 U.S. at 501. On the other hand, it argues that it presented sufficient evidence to support a claim of injury, thus implying that the district court's factual determination that the State had not established injury is erroneous. *Id*. at 15-18. It then advances a novel combination of the two standards, concluding that, "[t]he State has presented more than enough evidence to support its standing,

particularly at the motion-to-dismiss stage, when a plaintiff's allegations must be accepted as true." *Id*. at 18.

These contentions misapprehend the appropriate framework for evaluating a motion to dismiss for lack of jurisdiction. In *Williamson* v. *Tucker*, 645 F.2d 404 (5th Cir. 1981), the Court explained that where a FRCP 12(b)(1) motion to dismiss is based solely on the face of the complaint, the allegations of the complaint must be taken as true. *Id*. at 412. But where the factual bases for jurisdiction are placed at issue and the parties rely on matters outside the complaint, the trial court is *not* bound to accept the complaint's allegations as true; it instead has the power to evaluate written and oral evidence and to resolve disputed questions of fact bearing on its jurisdiction. *Id*. at 412-13; *see also Hertz Corp.* v. *Friend*, 559 U.S. 77, 96-97 (2010) ("When challenged on allegations of jurisdictional facts, the parties must support their allegations with competent proof").

The district court stated that it was treating the Secretary's motion to dismiss as mounting a facial attack on the complaint, and that the

allegations of the complaint must therefore be taken as true. ROA.864. The

court, however, also stated that it was basing its decision on the evidence

presented. ROA.857; ROA. 884. Indeed, its analysis reflects a point-by-

point assessment of the various reports, statistical studies, and affidavits

cited by the State in response to the Secretary's motion. *See* ROA.884-888.

Ultimately, the district court's holding rests in substance on

consideration of various evidentiary materials submitted by Mississippi

and the court's resolution of disputed questions of jurisdictional fact. *Cf.*

*Williamson*, 645 F.2d at 412 (appellate court "is not bound by label district

court puts on its action where underlying facts indicate that a different

action was in fact intended").

That approach was appropriate in light of the State's own litigation

conduct. Mississippi did not respond to the Secretary's motion by resting

on the allegations of its complaint. It instead cited the court to various

evidentiary materials purporting to establish injury-in-fact, specifically: a

state audit report appended to its complaint (ROA. 341), studies purporting

to document the fiscal impact of unlawful aliens on state resources (ROA.342; ROA.348), and a set of affidavits appended to its memorandum of law opposing the Secretary's motion (ROA.343-344; ROA. 352-373).   In that posture, the district court did not err in looking beyond the face of the complaint to consider evidence tendered by the State itself in support of jurisdiction.

On appeal, Mississippi contests the factual bases for the district court's holding.  Appellant Br. at 14-18.  But where, as in this case, the district court makes findings resolving disputed questions of jurisdictional fact, the reviewing court must accept those findings unless clearly erroneous.  *Williamson*, 645 F.2d at 413; *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir.  2014).   Mississippi has not demonstrated clear error.

First, although Mississippi relies on a 2006 audit report purporting to document the costs imposed by illegal aliens, that report falls well short of demonstrating that the district court clearly erred in finding no evidence of injury traceable to the challenged enforcement policies.  The report was

issued several years before the memoranda challenged here and thus affords no evidence whatsoever of a specific, additional burden attributable to implementation of the Secretary's prosecutorial discretion policies.

Second, there is no record evidence that the class of aliens for whom deferred action is potentially available are likely to impose a net, additional financial burden on the State. Mississippi cites a national study purporting to show high rates of welfare utilization among all households headed by illegal aliens with children. *See* Appellant Br. at 12. But even accepting that study as valid, Mississippi points to no evidence that the study's general conclusions apply to the specific class of aliens falling within the guidelines for requesting deferred action under DACA.

To request deferred action, an alien must have come to the United States at a young age, continuously resided here for at least five years, had significant education or military service, and be under age 30. ROA.432. DACA, moreover, facilitates an alien's ability to receive work

authorization, thereby increasing the likelihood that aliens covered by the

policy will engage in lawful employment.  There is no reasonable basis for

concluding that welfare utilization rates for all households with children

headed by illegal aliens apply to aliens who obtain deferred action under

DACA.  Rather, the more logical conclusion is that they are far more likely

to be productively and lawfully employed and to have made positive

contributions to the State through payment of taxes.

Third, Mississippi fails to account for the offsetting cost savings that

may result from increased enforcement efforts against groups of illegal

aliens who are far more likely to burden state resources.  A key purpose of

the prosecutorial discretion policy is to enable the Secretary to concentrate

enforcement resources on illegal aliens who have committed crimes or pose

other threats to the public safety or national security.  Any increase in the

number of such aliens removed will thus offset costs incurred in allowing

DACA-eligible aliens to remain.  Indeed, aliens who have committed a

crime or pose some other threat to public safety are apt to impose on the

State far higher costs than the costs, if any, imposed by aliens who have completed high school or military service.[7]

Mississippi argues that recent removal statistics show a decline in the total number of removals. It concludes that implementation of DACA has not resulted in offsetting cost savings from increased enforcement efforts against higher priority illegal aliens. Appellant Br. at 17-18. The 2013 removal statistics on which Mississippi now relies, however, do not provide any information on the removal of aliens who have committed crimes or who pose other threats to public safety. The cited statistics thus do not shed any light on whether DACA has generated offsetting costs savings by facilitating increased enforcement efforts against aliens likely to impose the greatest costs on a state. Nor do they indicate whether trends in removal statistics are attributable to the DACA policy or to some other factor.

---

[7] The National Institute of Corrections, an agency within the United States Department of Justice, reports that in FY 2010, it cost Mississippi more than $15,200 per year to house an inmate in a state operated prison facility. *See* < http://nicic.gov/statestats/?st=MS>.

4. <u>Mississippi's Allegations Of Injury Are Too Conclusory, Speculative, And Indefinite To Support Standing.</u>

Finally, even assuming that Mississippi's standing must, at this juncture of the case, be judged solely on the basis of the complaint, the State has not alleged a concrete and particularized injury sufficient to support standing:

> Central to the concept of "particularized" injury is the requirement that a plaintiff be affected in a "personal and individual way," *Defenders of Wildlife,* 504 U.S. at 560 n.1, and seek relief that "directly and tangibly benefits him" in a manner distinct from its impact on "the public at large," *id*. at 573-74. Without "particularized injury, there can be no confidence of 'a real need to exercise judicial review' or that relief can be framed 'no broader than required by the precise facts to which the court's ruling would be applied.'" *Warth* v. *Seldin*, 422 U.S. 490, 508 (1975) (quoting *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U.S. 208, 221-222 (1974)).

*Massachusetts*, 549 U.S. at 541 (Roberts, CJ., dissenting).

Mississippi's allegations fall well short of this standard. The State alleges that it "will be compelled to bear the foreseeable fiscal costs of the illegal aliens residing in Mississippi who are not placed in removal proceedings," ROA.112, ¶ 60, and that these costs include "costs associated

with educating illegal aliens in the State's K-12 school system; costs related to uncompensated healthcare provided by state agencies, hospitals, and clinics; law enforcement costs associated with arresting, prosecuting, and incarcerating illegal aliens in the, State's criminal justice system; and lost tax revenues and economic losses related to illegal aliens who work "off the books" and thereby avoid paying state taxes and/or who send "remittances" to relatives in foreign countries, diverting dollars that otherwise would remain in the State's economy and generate additional state tax revenues." ROA.113-114, ¶ 66.

These allegations amount to no more than a broad and conclusory assertion that the State is injured because it must expend resources on serving unlawful aliens who reside with its borders. The allegations do not identify these costs with any specificity. They do not identify the putative, added costs of serving the specific population falling within the guidelines for deferred action. And they do not offer an explanation of how the State is injured by the particular exercise of enforcement discretion challenged in

this litigation.  Indeed, the complaint expressly notes that its allegations of injury are based on a report issued in 2006, well before the 2011 and 2012 memoranda challenged here.  *See* ROA.113, ¶¶ 61-63.

Conclusory allegations that the state's budget or tax revenues will be harmed in some general way are not sufficient to support standing.  *See, e.g. Kleppe*, 533 F.2d at 672-73 ("[N]either the impairment of the state's ability to look after its citizens nor the diminution of its tax revenues constitutes sufficient injury to state proprietary interests to confer standing"); *Wyoming* v. *U.S. Dept. of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (same).  Thus, even if review is confined to the allegations of the complaint, the district court was correct in dismissing Mississippi's claims for lack of standing.

<u>II</u>. The Plaintiff Immigration Officers' Employment-Related Claims Are Not Ripe for Adjudication.

No plaintiff has been disciplined for failing to follow agency policy.[8] The district court nonetheless reasoned that because plaintiffs intend to violate the policy and face a clear threat of adverse employment consequences if they do, their claims are justiciable. ROA.875-878. The court further concluded that plaintiffs' challenge was ripe because the issues turn on pure questions of law rather than fact, and because the "direct and immediate" threat of disciplinary action renders the issues fit for judicial review at this time. ROA.883; ROA.954-955.

---

[8] There are ten, individual immigration officers named as plaintiffs. ROA.102-104. Only one of them, James Doebler, has thus far been subject to any action for failure to follow DHS prosecutorial discretion policy. Officer Doebler commenced removal proceedings against an alien covered by the policy, contrary to his supervisor's instructions. In response, DHS issued Doebler a non-disciplinary letter cautioning him to follow supervisory instructions. ROA.471-472; ROA.628-629. The letter thus states that "[t]his Final Decision will serve as a *non-disciplinary* counseling to you and will not be placed in your Official Personnel Folder * * *." ROA.629. (emphasis added).

The court's ripeness analysis is incorrect. Ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno* v. *Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n. 18, 1 (1993). Its "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 148. (1967). Determining whether a claim is ripe for judicial review requires the evaluation of (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Id.* at 149; *see also Ohio Forestry Ass'n, Inc.* v. *Sierra Club*, 523 U.S. 726, 733 (1998). Thus, "even where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness." *Cent. & Sw. Servs.* v. *EPA*, 220 F.3d 683, 690 (5th Cir. 2000).

Plaintiffs' employment-related claims are not ripe under these standards. First, plaintiffs will suffer no cognizable injury if they comply with the challenged policy. Many of the ripeness cases cited by the district

court are distinguishable for this reason alone. In *Abbott Labs*, for example, the plaintiffs were required either to incur substantial and unrecoupable compliance costs if they complied with the challenged regulation or to risk substantial civil and criminal penalties if they violated the regulation in order to test its validity in court. *Id.*, 387 U.S. at 152-53. This dilemma imposed a direct and immediate hardship on the *Abbott* plaintiffs that made the case appropriate for pre-enforcement review.

Similarly, in *United Food & Commercial Workers Int. Union* v. *IPB, Inc.*, 857 F.2d 422 (8th Cir. 1988), the plaintiffs – unions and union officials – faced a similar dilemma of choosing between forgoing First Amendment rights of expression in order to comply with an anti-picketing statute or risking criminal prosecution for violating the statute. In these cases, the coerced compliance with a law believed to be invalid resulted in actual, concrete injury to the plaintiff.

Plaintiffs, in contrast, suffer no comparable, irremediable injury if they comply with the DHS policy. Their only "harm" is being compelled to

carry out their official job duties in a way that they believe violates applicable immigration statutes.  Such consequences, however, do not arise to an injury-in-fact for purposes of Article III.  *See Donelon* v. *La. Div. of Adm. Law ex rel. Wise*, 522 F3d 564 (5th Cir. 2008) (a plaintiff lacks standing if the only consequence that flows from adhering to a challenged policy would be a perceived violation of the plaintiff's oath to uphold law); *Finch* v. *Mississippi State Med. Ass'n*, 585 F.2d 765 (5th Cir. 1978) (same).

Second, should plaintiffs violate the policy and be subject to an unlawful adverse employment action, any resulting harm can be remedied in a post-enforcement action for administrative and/or judicial review.  As explained more fully below, the Civil Service Reform Act establishes a comprehensive remedial scheme for redressing federal employment sanctions that are contrary to law.  In the case of employment terminations or other more serious sanctions, for example, the reviewing court has a broad remedial power to set aside the sanction and, where appropriate, to order back pay and attorney fees.  Thus, any concrete employment injury

53

plaintiffs are likely to incur as a result of failing to adhere to a policy they believe to be unlawful is, if their legal contentions are correct, fully remediable in a post-enforcement action for administrative or judicial review. Postponing review until a final agency action would not impose a significant hardship on the plaintiffs.

Finally, pre-enforcement review is a significant and inappropriate intrusion into the government's management of its employees. Even before enactment of the Civil Service Reform Act (which now affords the exclusive remedy for claims like those pressed here), the Supreme Court stressed that the government has traditionally been granted the widest latitude in the dispatch of its own internal affairs, and that preliminary injunctive relief in federal personnel disputes before exhaustion of administrative remedies is disfavored absent a strong showing of irreparable injury. *Sampson* v. *Murray*, 415 U.S. 61, 83-84 (1974); *see also Ohio Forestry Ass'n, Inc.*, 523 U.S. at 733 (1998) (in determining whether a case is ripe for review, the court should evaluate, among other factors,

"whether judicial intervention would inappropriately interfere with further administrative action"). For all these reasons, plaintiffs' employment-related claims are not ripe for adjudication.

    III.  The Civil Service Reform Act Precludes District Court Jurisdiction Over The Plaintiff Immigration Officers' Claims Of Employment-Related Injury.

Even assuming plaintiffs' claims could be deemed ripe, the Civil Service Reform Act bars district court jurisdiction over claims arising out of a federal employment dispute.

    A.  <u>The CSRA Establishes A Comprehensive Remedial Scheme For Resolving Federal Employment Disputes</u>.

The CSRA, 5 U.S.C. 1101, *et seq.*, "established a comprehensive system for reviewing personnel actions taken against federal employees." *United States* v. *Fausto*, 484 U.S. 439, 455 (1988). In particular, it created a three-tiered system providing graduated procedural protections based on the seriousness of the personnel action at issue.

First, for major personnel actions such as removal, suspension exceeding 14 days, or reduction in grade or pay, the employee has a right

to an administrative hearing before the Merit Systems Protection Board.  If

the employee prevails, the MSPB is authorized to order relief, including

reinstatement, backpay, and attorney fees.  *Elgin* v. *Dept. of Treasury*, 132 S.

Ct. 2126, 2130 (2012).  If the MSPB sustains the adverse personnel action,

the employee has a right of appeal to the Federal Circuit, which has

plenary authority to set the agency act aside and to order backpay or other

appropriate relief.  *Ibid*; *Smith* v. *Department of the Army*, 458 F.3d 1359, 1364

(Fed. Cir. 2006);  5 U.S.C. 7703(b).

Second, for specified "personnel actions infected by particularly

heinous motivations or disregard of law ('prohibited personnel practices'),"

there are administrative proceedings followed by judicial review in the

Federal Circuit under specified circumstances.  *Carducci* v. *Regan*, 714 F.2d

171, 175 (D.C. Cir.  1983).  Employees who wish to challenge prohibited

personnel practices may thus file a complaint with the Office of Special

Counsel.  5 U.S.C. 1214(a)(1).   If the Special Counsel finds reasonable

grounds to believe an employee was or is to be subjected to a prohibited

personnel practice, he may seek remedial action from the agency and the

MSPB.  5 U.S.C. 1214(b)(2).  The employee may thereafter seek judicial

review in the Federal Circuit of any adverse decision of the MSPB in any

case in which the Special Counsel has sought corrective action from the

MSPB.  5 U.S.C. 1214(c)(1), 7703(b)(1).

The statute provides additional remedies for employees who are

subjected to, or threatened with, disciplinary action, for "refusing to obey

an order that would require the individual to violate a law."  5 U.S.C.

§2302(b)(9)(D).  Such disciplinary actions are defined as a "prohibited

personnel practice."  *Ibid*.  An employee adversely affected by such a

prohibited personnel practice may thus seek corrective action by first

seeking relief from the Office of  Special Counsel.  5 U.S.C. § 1214(a)(3).  If

the employee is dissatisfied with the decision of the Office of Special

Counsel, he may then appeal to the Merit Systems Protection Board.  *Ibid*; 5

U.S.C. § 1221(a).  If dissatisfied with the MSPB's decision, he may then seek

judicial review in the appropriate court of appeals.  5 U.S.C. § 1221(h); 5

U.S.C. § 7703. Thus, an employee who is disciplined for refusing to follow an order that would compel him to violate the law ultimately has an appeal of right to an Article III court upon exhaustion of administrative remedies, regardless of whether the Special Counsel or MSPB conclude that corrective action is necessary.

Third, for matters involving bargaining-unit employees, there is a grievance procedure followed by binding arbitration and limited judicial review in the courts of appeals, 5 U.S.C. §§ 7121, 7122, & 7123. *See generally Cornelius* v. *Nutt*, 472 U.S. 648, 652 (1985). Covered grievances include a complaint concerning "any matter relating to the employment of the employee," 5 U.S.C. 7103(a)(9)(A) (which thus includes adverse actions and prohibited personnel practices) as well as "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. 7103(a)(9)(C)(ii). Any covered grievance that is not settled by the negotiated grievance procedure is subject to binding arbitration, which may be invoked by either the union

or the agency.  5 U.S.C. 7121(b)(1)(C)(iii).  Arbitral awards are subject to

limited review by the Federal Labor Relations Authority.  5 U.S.C. 7122(a).

The FLRA's order, however, is not subject to judicial review unless it

involves a matter defined as an "unfair labor practice."  5 U.S.C. 7123(a)(1);

*see U.S. Dept. of the Treasury* v. *FLRA*, 43 F.3d 682 (D.C. Cir. 1994).

B.  <u>CSRA Remedies Are Exclusive And Bar District Court
Jurisdiction Over Claims Arising Out Of A Federal
Employment Dispute</u>.

In *Fausto*, the Supreme Court held that Congress enacted the CSRA to

establish a uniform set of remedial procedures for federal employment

disputes, and that these remedies were consequently intended to be the

sole and exclusive means of contesting an adverse employment action.  The

Court explained that before 1978, federal employment law consisted of an

"outdated patchwork of statutes and rules built up over almost a century."

*Id.*, 448 U.S. at 444 (quoting S. Rep. No. 969, 95th Cong., 2d Sess. 3 (1978)).

There was no systematic scheme for review of federal personnel actions.

Some employees were afforded administrative review of adverse personnel

action by statute or executive order; others had no right to such review. Federal employees often sought judicial review of agency personnel decisions in "district courts in all Circuits and the Court of Claims," through "various forms of actions * * * including suits for mandamus, injunction, and declaratory judgment." *Id*. at 444-445 (citations omitted). "Criticism of this 'system' of administrative and judicial review was widespread." *Id*. at 445. There was "particular * * * dissatisfaction" with the lack of uniformity that stemmed from having cases adjudicated "under various bases of jurisdiction" in numerous district courts and the Court of Claims. *Ibid.*

Congress responded by enacting in the CSRA "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Id*. at 445. The CSRA accordingly provides a "comprehensive" scheme of protections and remedies for federal employment disputes, *id*. at 448, and "prescribes in

great detail the protections and remedies applicable * * * , including the

availability of administrative and judicial review," *id.* at 443.

The Supreme Court has made clear that these CSRA remedies are the

exclusive means of obtaining judicial review of claims arising out of federal

employment disputes and, with one exception not relevant here, preclude

district court jurisdiction.[9] *Fausto*, 484 U.S. at 448-51, 455; *Elgin*, 132 S. Ct. at

2133-34. Thus, where the statute provides a judicial remedy through

Federal Circuit review of a Merit Systems Protection Board decision,

district court review is precluded, even if the employee seeks equitable

relief for an alleged constitutional violation. *Id.* at 2134-35. And if the

CSRA does not afford any right to judicial review – as is the case for some

minor personnel disputes and certain categories of employees – that means

that judicial review is precluded entirely, not that the aggrieved employee

---

[9] Where an employee alleges that a challenged employment action was based on discrimination prohibited by the Civil Rights Act or other specified anti-discrimination laws, the employee may ultimately seek judicial review in district court. *Elgin*, 132 S. Ct. at 2134. No discrimination claims are at issue here, however.

may bring an extra-statutory review action in district court. *Fausto*, 484 U.S. 439 (1988); *McAuliffe* v. *Rice*, 966 F.2d 979 (5th Cir. 1992); *Graham* v. *Ashcroft*, 358 F.3d 931, 933-35 (D.C. Cir. 2004) (Roberts, J.); *Mangano* v. *United States*, 529 F.3d 1243, 1246 (9th Cir. 2008).

C.  <u>The CSRA Precludes Plaintiffs' Claim For Prospective Injunctive Relief</u>.

Plaintiffs argue that, because the CSRA provides remedies only for an employment action that has already occurred, it does not preclude suits that seek relief against potential, *future* employment discipline based on plaintiffs' prospective failure to comply with a policy that is assertedly unlawful.  Appellant Br. at 20-23.   There are two errors in this argument.

First, it falsely equates the lack of a right to pre-enforcement relief with the lack of *any* meaningful remedy for a disputed employment action. Plaintiffs insist that they have no means of bringing a pre-enforcement action for judicial review.  But the lack of pre-enforcement remedy does not mean that they lack any CSRA remedy for challenging an adverse employment action.  It means only that they must await a final agency

action before having access to the CSRA remedial scheme -- consistent with the Supreme Court's longstanding, pre-CSRA view that preliminary injunctive relief in federal personnel disputes is strongly disfavored. *Sampson,* 415 U.S. at 83-84 (1974).

Second, it is well settled that the absence of CSRA remedy for an adverse employment action means, not that such remedies may be sought in district court, but that Congress intended to preclude them entirely. This point is made explicit in *Fausto* and this Court's precedents.

*Fausto* involved employment-related claims by a group of "excepted service" civil service employees who, at that time, did not have remedies under the CSRA. The Court held that Congress's failure to provide a particular CSRA remedy indicated, not that the plaintiff employees could seek that remedy in district court, but rather that Congress intended that no remedy be provided:

> It seems to us evident that the absence of provision for these employees to obtain judicial review is not an uninformative consequence of the limited scope of the statute, but rather

manifestation of a considered congressional judgment that they should not have statutory entitlement to review * * *."

*Id*. at 448-49.

This Court followed *Fausto* in *McAuliffe* v. *Rice*, 966 F.2d 979 (5th Cir. 1992). There, a former civilian employee of a non-appropriated fund instrumentality brought a district court action challenging her termination from employment. Employees of such instrumentalities were not afforded remedies under the CSRA. *Id*. at 979. The Court, citing *Fausto*, concluded that the absence of CSRA remedies indicated an intent to foreclose jurisdiction entirely and therefore precluded district court review of the termination under the Administrative Procedure Act. *Id*. at 980. *Accord Galvin* v. *FDIC*, 48 F.3d 531, 1995 WL 84520 (5th Cir. 1995) (unpublished); *Broadway v. Block*, 694 F.2d 979 (5th Cir. 1982); *Towers* v. *Horner*, 791 F.2d 1244, 1246 (5th Cir. 1986); *Graham* v. *Ashcroft*, 358 F.3d 931, 933-35 (D.C. Cir. 2004) (Roberts, CJ.); *Mangano* v. *United States*, 529 F.3d 1243, 1246 (9th Cir. 2008); *Pinar* v. *Dole*, 747 F.2d 899, 910-13 (4th Cir. 1984).

None of the cases cited by plaintiffs is to the contrary. *Whitman* v.

*Dep't of Transportation*, 547 U.S. 512 (2006), did not reach a holding as to

whether the CSRA barred federal question jurisdiction over the claims

before the Court but rather vacated the lower court decision and remanded

for further consideration of jurisdictional issues. *Id*. at 514-15. It does not

hold that federal question jurisdiction is available whenever the CSRA fails

to afford remedy – a result that would be inconsistent with the Court's

prior decision in *Fausto* as well as its subsequent decision in *Elgin*.

*AFGE Local I* v. *Stone*, 502 F.3d 1027 (9th Cir. 2007), is also inapposite.

It holds that where a federal employee lacks any CSRA remedy for

challenging an allegedly unconstitutional federal personnel action, suit

may be brought in district court. Unlike the plaintiff in *AFGE*, the plaintiff

immigration officers do have a CSRA remedy for contesting a final adverse

employment action and, after exhaustion of administrative remedies, can

bring statutory or constitutional claims before an Article III court. Access

to these remedies must await a final agency action.  But that means only that CSRA review is postponed, not foreclosed.

*Heslabeck* v. *United States*, 821 F. Supp. 404 (E.D. N.C. 1993), does not provide any further support for plaintiffs' position.  It holds that where an employee of a "nonappropriated funds instrumentality" lacks a CSRA remedy for a challenging an adverse employment action, he may bring suit in district court.  This Court, however, has rejected that conclusion and, citing *Fausto*, held that the CSRA precludes federal question jurisdiction over challenges to a personnel action brought by employees of a non-appropriated funds instrumentality.  *McAuliffe*, 966 F.2d at 979-81. *Heslabeck* is thus contrary to Circuit precedent as well as *Fausto* and *Elgin*.

Finally, *NTEU* v. *Devine*, 577 F. Supp. 738 (D.D.C. 1983), involved claims brought by a union, not a federal employee, and in any event predates both *Fausto* and *Elgin*.  It thus is not persuasive authority on whether the employee claims at issue here are precluded by the CSRA.

It would be particularly anomalous to permit claims challenging a yet-to-be-taken disciplinary action to be heard in district court while requiring claims challenging a completed disciplinary action taken on the basis of the very same, disputed agency policy to be channeled through the CSRA.  Such bifurcated review procedures would invite a flood of new federal employment actions within this and other regional courts of appeals, frustrate Congress's intent to "supplant the hodgepodge of judicial remedies" that had existed before the CSRA, and "undermine the goals of unitary decisionmaking and consistency intended by the CSRA." *McAuliffe*, 966 F2d at 980.  For all these reasons, plaintiffs err in asserting that claim for pre-enforcement relief against a prospective employment action is excepted from CSRA preclusion.

D.  <u>Statutory And Constitutional Claims Are Not Excepted From The CSRA's Exclusive Remedial Scheme</u>.

Plaintiffs also err in asserting that their employment-related claims fall outside the CSRA exclusive remedial scheme because they rest on contentions that any adverse employment action would be based on

plaintiffs' failure to comply with policies that violate federal statutes and the Constitution. That contention is foreclosed by *Elgin*.

In *Elgin*, the plaintiffs were terminated because they had failed to comply with a federal statute barring from federal employment anyone who has knowingly and willfully failed to register for the Selective Service. Plaintiffs, who were male employees, alleged that this statute unlawfully discriminated against them on the basis of their gender because only men, and not women, were required to register for the draft. Plaintiffs concluded that their terminations were unlawful as well, because the terminations were based upon plaintiffs' failure to comply with an unconstitutional statute. But rather than challenge their terminations through the remedies established by the CSRA, plaintiffs sought equitable and declaratory relief in district court under general federal question jurisdiction.

The Supreme Court held that the CSRA precluded district court jurisdiction. The Court reasoned that "[j]ust as the CSRA's elaborate

framework demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review, it similarly indicates that extra-statutory review is not available to those employees to whom the CSRA *grants* review." *Id.*, 132 S. Ct. at 2133 (internal quotations and citation omitted). The Court specifically rejected attempts to carve out an exception to CSRA exclusivity for constitutional challenges to federal statutes underlying an adverse employment action, reasoning that the text and structure of the CSRA provide no support for such an exception (*id*. at 2134), and that allowing such suits to proceed outside the CSRA would "reintroduce the very potential for inconsistent decisionmaking and duplicative judicial review that the CSRA was designed to avoid." *Id*. at 235.

Plaintiffs ignore *Elgin* and instead assert that numerous federal courts have exercised jurisdiction to adjudicate constitutional or statutory claims challenging their employers' policies. *See* Appellant Br. at 25-27. The cited cases, however, all predate *Elgin*, many predate *Fausto* as well, and none is

Circuit precedent.  They are consequently of no precedential weight in determining whether plaintiffs' claims are foreclosed here.  *Elgin* is controlling.  And it makes plain that the employment-related claims are not excepted from CSRA's exclusive remedial scheme merely because they rest on contentions that an adverse employment action violates a statute or the Constitution.

IV.  *Leedom* v. *Kyne* Does Not Authorize Plaintiffs To Circumvent The Jurisdictional Limitations Of The Civil Service Reform Act.

Plaintiffs also err in asserting that, notwithstanding the Civil Service Reform Act, the district court may assume jurisdiction under principles established in *Leedom* v. *Kyne*, 358 U.S. 184 (1958).   In *Leedom*, union representatives challenged a National Labor Relations Board order including both professional and nonprofessional employees within the same collective bargaining unit without the professional employees' consent, even though such units were specifically prohibited by the governing statute.  *Id.*  at 186.

70

The Court held that although bargaining unit certifications were not reviewable final orders under the National Labor Relations Act, the district court nonetheless had jurisdiction to consider the union's challenge. *Id.* at 191. It explained that the lawsuit was not one to "review" a decision of the Board made within its jurisdiction; rather the suit challenged an agency order made in excess of the Board's delegated powers and contrary to a specific prohibition in the Board's enabling legislation. *Id*. at 188. The Court reasoned that it could not "lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." *Id*. at 190. It thus concluded that, despite the governing statute's failure to provide for judicial review, Congress intended that the statutory rights violated by the NLRB remain judicially enforceable through the general jurisdiction of the federal courts. *Id*. at 190-191.

Subsequent precedents have stressed the "narrow limits" and "painstakingly delineated procedural boundaries" of *Leedom* jurisdiction.

*Boire* v. *Greyhound Corp.*, 376 U.S. 473, 481 (1964); *Brotherhood of Ry. & S.S.*

*Clerks* v. *Association for the Benefit of Non-Contract Employees*, 380 U.S. 650,

660 (1965); *Kirby Corp.* v. *Pena*, 109 F.3d 258, 269 (5th Cir. 1997). The case

law accordingly establishes that *Leedom* jurisdiction is unavailable if the

plaintiff has an alternative means of securing judicial enforcement of

statutory rights. *Board of Governors of the Federal Reserve System* v. *MCorp*,

502 U.S. 32, 465-66 (1991); *see Leedom*, 358 U.S. at 190-191; *id*. at 197

(Brennan, J., dissenting); *see also American Airlines, Inc.* v. *Herman*, 176 F.3d

283, 293-94 (5th Cir. 1999); *Telecommunications Research and Action Center* v.

*FCC*, 750 F.2d 70, 78 (D.C. Cir. 1984); *Quivira Mining Co.* v. *EPA* , 728 F.2d

477, 484 (10th Cir. 1984); *Compensation Dep't* v. *Marshall*, 667 F.2d 336, 343-

344 (3d Cir. 1981); *Nor-Am Agricultural Products, Inc. v. Hardin*, 435 F.2d

1151, 1159-1160 (7th Cir. 1970) (en banc). And it cautions that *Leedom*

jurisdiction is reserved for correction of patently *ultra vires* agency action

and thus is not available merely to resolve disputed questions of statutory

construction. *McLendon* v. *Jackson Television, Inc.*, 603 F.3d 1174, 1177 (5th

72

Cir. 1979); *Kirby*, 109 F.3d at 269, quoting *Dart* v. *United States*, 848 F.2d 217, 231 (D.C. Cir. 1988); *accord Paladin Community Mental Health Center* v. *Sebelius*, 684 F.3d 527, 532-33 (5th Cir. 2012).

Both limitations preclude resort to *Leedom* jurisdiction here. First, the CSRA provides a detailed and comprehensive set of remedies for disputing an adverse employment action, including provisions that afford a right to administrative and judicial review to employees who allege that they have been subjected to or threatened with adverse disciplinary action for "refusing to obey an order that would require the individual to violate a law." 5 U.S.C. § 2302(b)(9)(D). *Leedom* jurisdiction is foreclosed for that reason alone.

Plaintiffs insist that these CSRA remedies are inadequate, asserting that they do not permit review unless the employee has been subjected to a completed disciplinary action or concrete and specific threat of one, and noting that the MSPB recently dismissed for lack of jurisdiction their administrative complaints seeking to stay any adverse employment action

predicated on plaintiffs' failure to follow DACA policy.  Appellants Br. at 37-41.

None of these contentions demonstrates that plaintiffs lack a meaningful remedy for a disputed adverse employment action.  That plaintiffs must await an actual or more concrete and particularized threat of disciplinary action before invoking these remedies is fully consistent with settled principles requiring exhaustion of administrative remedies and final agency action.  And because a plaintiff who succeeds in a CSRA action may obtain backpay, reinstatement, or other substantial relief (*see* 5 U.S.C. § 1221(g)(1)(A)), there is no basis for plaintiffs' contention that these remedies are inadequate and require supplementation with a right to pre-enforcement relief under *Leedom* jurisdiction.

Plaintiffs further err in asserting that the Merit Systems Protection Board's dismissal of their recent claims for pre-enforcement relief demonstrates that CSRA remedies are inadequate.  The MSPB held only that plaintiffs must exhaust their administrative remedies before the Office

of Special Counsel, and that they could then file an appeal with the Board

after having done so.  *See Martin* v. *DHS*,  2014 WL 1900939 (MSPB May 9,

2014).  Contrary to plaintiffs' contentions, the recent MSPB decisions

confirm that CSRA remedies are available to an employee who alleges that

he has been subjected to disciplinary action for refusing to obey an order

that would require him to violate the law.

Second, a dispute as to the permissible scope of the Secretary's

prosecutorial discretion does not implicate the kind of patent abuse of

administrative power warranting extra-statutory review under *Leedom.*

The Secretary's exercise of prosecutorial discretion in removal proceedings

is consistent with longstanding administrative practice.  Unlike the

essentially lawless action at issue in *Leedom*,  the Secretary's general

authority to exercise prosecutorial discretion in removal proceedings has

been acknowledged in two Supreme Court precedents.  *Reno* v. *American*

*Arab Anti-Discrimination Committee*, 525 U.S. 471, 483-84 (1999); *Arizona* v.

*United States*, 132 S. Ct. 2492, 2499 (2012).   Plaintiffs argue that this long-

recognized enforcement discretion has been partially limited by statute.

But even if that assertion were correct – and, as we show below, it is not – a

dispute as to the meaning of federal statutes allegedly limiting the

Secretary's prosecutorial discretion at one stage of a removal proceeding

does not warrant circumventing the remedies and jurisdictional limitations

established by the Civil Service Reform Act.

Plaintiffs' amicus, Eagle Forum, similarly errs in contending that

*Leedom* jurisdiction is available to determine whether the Secretary erred by

issuing the DACA policy without following the "notice and comment"

rulemaking procedures of the Administrative Procedure Act.  *Leedom*

jurisdiction is reserved for errors that are of a "*summa* or *magna* quality"

*McLendon*, 603 F.3d at1177 (5th Cir. 1979).  We are aware of no case holding

that an alleged failure to comply with procedural rulemaking requirements

rises to that level.   Moreover, the DACA policy explicitly states that it

"confers no substantive right, immigration status or pathway to

citizenship" but is intended "to set forth policy for the exercise of discretion

within the framework of existing law." ROA.434. Such statements of agency policy are not subject to "notice and comment" rulemaking requirements in the first instance. *See Shell Offshore Inc.* v. *Babbitt*, 238 F.3d 622, 627-29 (5th Cir. 2001); *Mada-Luna* v. *Fitzpatrick*, 813 F.2d 1006, 1012-17 (9th Cir. 1987) (INS operating instruction on deferred action not subject to notice and comment rulemaking).

At bottom, plaintiffs seek to circumvent the CSRA and proceed directly to district court under *Leedom* jurisdiction because "[t]he MSPB was created to adjudicate garden-variety employment disputes * * * not to review the constitutionality or legality of nationwide executive policies." Appellant Br. at 41. Plaintiffs stress that they seek, not merely individualized relief from employment actions directed against them personally, but broad declaratory and injunctive relief against the entire, nationwide application of the DACA policy. *Id.* at 42. They conclude that the lack of such broad remedies under the CSRA supports district court jurisdiction.

But is not just the CSRA that denies plaintiffs a district court remedy for such claims. It is also the "case and controversy" requirements of Article III. Subordinate officers of the Department of Homeland Security do not have standing merely because they disagree with the Secretary's interpretation of the statutes he is charged with administering. Like the state of Mississippi or members of the public in general, the plaintiff immigration officers cannot invoke the district court's jurisdiction merely because, in their view, the federal government is not acting in accordance with the law. *Allen*, 468 U.S. at 754. Such generalized grievances will not suffice. Plaintiffs must instead base their claim on some concrete and particularized injury-in-fact.

The only such claim here, the only claim that would support the plaintiff immigration officers' standing, is one premised on a potential employment-related sanction. The CSRA affords the exclusive avenue for obtaining judicial review in this context, and it precludes resort to federal question jurisdiction, *Leedom* jurisdiction, or any other basis for bringing

suit in district court.  The district court therefore correctly dismissed the

plaintiff immigration officers' claims for lack of subject matter jurisdiction.

### V. The Immigration Statutes Do Not Limit The Secretary's Prosecutorial Discretion To Defer Enforcement Action.

If the Court finds that the district court erred in dismissing the case

for lack of jurisdiction it should nonetheless direct judgment for the

Secretary on the alternative grounds that the pertinent immigration

statutes do not limit the Secretary's discretion to decline to institute

removal proceedings.[10]

In *Heckler* v. *Chaney*, 470 U.S. 821, 833-24 (1985), the Court stated that

an agency's decision not to undertake enforcement action has traditionally

---

[10] We have raised this merits issue by means of a cross appeal, rather than merely asserting it as an alternative grounds for affirmance.  An appellee may seek affirmance on any ground preserved in the record, provided he does not seek to enlarge rights under the judgment. *Weaver v. Texas Capital Bank N.A.*, 660 F.3d 900, 905-06 (5th Cir. 2011).  A judgment on the merits rather than on jurisdiction, however, confers additional rights to foreclose subsequent litigation.  It must thus be raised through an independent, cross-appeal.  *See Arvie* v. *Broussard*, 42 F.3d 249, 250 (5th Cir. 1994) (per curiam); *American Bottom Conservancy* v. *U.S. Army Corps of Engineers*, 650 F.3d 652, 660 (7th Cir. 2011).

been committed to agency discretion and is therefore presumptively

unreviewable.  It noted that "Congress may limit an agency's exercise of

enforcement power if it wishes, either by setting substantive priorities, or

by otherwise circumscribing an agency's power to discriminate among

issues or cases it will pursue."  *Id*. at 833.  But the presumption is that the

agency itself is best situated to determine whether "agency resources are

best spent on this violation or another, whether the agency is likely to

succeed if it acts, whether the particular enforcement action requested best

fits the agency's overall policies, and, indeed, whether the agency has

enough resources to undertake the action at all."  *Id*. at 831.

As explained above, the government has a longstanding policy of

exercising prosecutorial or enforcement discretion in determining whether

to remove aliens from the country, and it has historically stressed that a

decision not to proceed should be made at the earliest feasible stage of the

removal process.  *Chaney* makes clear that Congress may circumscribe that

discretionary power.   But given the presumption that enforcement

decisions are committed to agency discretion and the very long history of

prosecutorial discretion in the enforcement of immigration laws, it should

not be deemed to have done so here absent a clear and unequivocal

statutory command.

The statutes cited by the plaintiffs do not reflect a clear intent to limit

DHS's enforcement discretion.  As an initial matter, the provisions stating

that aliens "shall be detained" for removal proceedings apply only to an

"alien seeking admission."  They thus do not apply to aliens who are

already present within the United States, and who are taking no action to

"seek" admission.  *See* 8 U.S.C. § 1225(b)(2)(A).

In particular, the statute provides that an "applicant for admission"

includes two categories of aliens:  those who are "present in the United

States" but who have not been lawfully admitted (§ 1225(a)(1), first clause),

and those who "arrive[] in the United States" (§ 1225(a)(1), second clause).

Aliens potentially eligible for prosecutorial discretion under the DACA

policy fall within the first category, pertaining to those who are already

physically present within the United States.[11] Such aliens are "deemed" to

be "applicants for admission" by operation of law.  *See* 8 U.S.C. §

1225(a)(1).  But unlike aliens arriving at the border, they are not engaged in

any affirmative behavior that could be characterized as "seeking

admission." *Cf.  Webster's Third New International Dictionary* at 2055 (1993)

(defining "seek," in sense relevant here, as "to go in search of; to try to

acquire or gain; to make an attempt").  Indeed, if Congress intended the

"shall detain" provision of section 1225(b)(2)(A) to apply to both categories

of applicants for admission, it could easily have phrased the statute to

apply to any "applicant for admission."  It instead used different

phraseology that, in its ordinary sense, is not applicable to aliens who are

---

[11] *See* ROA.432 (to be considered, an alien must have been present in the United States on the June 2012 effective date of the memorandum and have continuously resided in the U.S. for at least five years preceding the effective date of the memorandum).

already present within the United States, and who are not taking action to "seek" admission.[12]

Even assuming that section 1225(b)(2)(A) applies to inadmissible aliens found within the United States, that statute does not constrain the government's longstanding discretion to determine whether commencement of removal proceedings is appropriate. Construing section 1225(b)(2)(A) as imposing a mandatory duty merely to *commence* removal proceedings would yield nonsensical results. The statutory provisions on which plaintiffs and the district court rely apply only to the initial stage of a removal proceedings – the decision to file a "notice to appear" commencing administrative proceedings. As the district court

---

[12] For similar reasons, the statutory directive to detain, for removal proceedings, aliens seeking admission does not apply to aliens who were previously admitted to the United States but overstay their authorization. Although these aliens may be eligible for deferred action under the DACA policy, they are not "applicants for admission" and are not taking action to "seek" admission. Plaintiffs accordingly make no claim that the government is statutorily compelled to commence removal proceedings against them, nor do they contend that any order barring application of DACA should apply to this group of aliens.

acknowledged, even under plaintiffs' interpretation, the government would remain free to exercise the very same prosecutorial discretion by terminating removal proceedings at any subsequent stage of the case. *See* ROA.951. Plaintiffs' construction would thus compel the government to commence removal cases that it has no intention of prosecuting further, and no legal obligation to pursue to conclusion. Construing the statute to nonetheless mandate commencement of removal proceedings would waste administrative resources, burden the alien and his or her family, and leave the government's ultimate enforcement choices unaffected.

The plain language of the statute does not compel such absurd results. Contrary to the district court's reasoning, when words like "shall" are used in the enforcement context, they are ordinarily *not* interpreted as imposing an inflexible mandate that prohibits the agency from determining that enforcement action is unwarranted. Although "'shall' is normally interpreted to impose a mandatory duty * * * when duties within the traditional realm of prosecutorial discretion are involved, the courts have

not found this maxim controlling." *Seabrook* v. *Costle*, 659 F.2d 1371, 1374

n.3 (5th Cir. 1981).  Numerous other cases are to the same effect.  *See, e.g.,*

*Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (recognizing "[t]he

deep-rooted nature of law-enforcement discretion, even in the presence of

seemingly mandatory legislative commands"*); Dubois* v. *Thomas*, 820 F.2d

943, 946-47 (8th Cir. 1987) (finding, in context of Federal Water Pollution

Control Act, that the word "shall" did not impose a mandatory duty to

bring an enforcement action, and collecting cases reaching same result);

*Wood* v. *Herman*, 104 F. Supp. 2d 43, 47 (D.D.C. 2000) ("While it is a

recognized tenet of statutory construction that the word 'shall' is usually a

command, this principle has not been applied in cases involving

administrative enforcement decisions." (citation omitted)). [13]

---

[13] In *Dunlop* v. *Bachowski*, 421 U.S. 560 (1975), the Court held that the Secretary of Labor's decision to refrain from commencing a civil action under a statute providing that the Secretary "shall" bring a civil action if he found probable cause to support a union member's complaint was subject to judicial review.  The Court, however, further held that the statute relied on the Secretary's specialized knowledge and discretion in making this enforcement determination, and that, notwithstanding the ostensibly

Here, the operative statutory language is directed, not at the decision

as to whether to commence removal proceedings in the first instance, but at

whether the government must *detain* an alien *after* it has determined to seek

the alien's removal.  The statute thus provides, not that the government

"shall" commence removal proceedings against all inadmissible aliens, but

rather that "the alien shall be detained for a [removal] proceeding."  8

U.S.C. § 1225(b)(2)(A).  It thus does not displace the government's

longstanding discretion to decide whether enforcement action is warranted

in the first instance.

The legislative history, moreover, does not reflect any congressional

intent to limit the government's discretion to refrain from initiating

removal proceedings in light of humanitarian factors, resource constraints,

or other matters of enforcement policy.  As relevant here, the current

statutory scheme is the result of amendments made by the Illegal

---

mandatory language of the statute, "the reviewing court is not authorized
to substitute its judgment for the decision of the Secretary not to bring
suit."  *Id*. at 571.

Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–

208, Div. C. Title III, " 301 & 302, 110 Stat. 3009-575-584 (1996).

These amendments were "intended to replace certain aspects of the

'entry doctrine,' under which illegal aliens who have entered the United

States without inspection gain equities and privileges in immigration

proceedings that are not available to aliens who present themselves for

inspection at a port of entry." H. Rep. No. 104-469, Pt. 1, 104th Cong., 2d

Sess. 225-26 (1996). The change was effected by, among other provisions,

amending 8 U.S.C. § 1225 [Immigration and Nationality Act § 235] so as to

provide that aliens who had gained entry to the United States without

inspection would nonetheless be deemed applicants for admission and

thereby removable on the same grounds, and through the same

procedures, applicable to aliens arriving at the border. *See* H. Conf. Rep.

No. 104, 828, 104th Cong., 2d Sess. 208 (1996).

These procedures made it substantially more difficult for an alien

who had gained entry without inspection to avoid removal. *Cf.* 8 U.S.C. §

1229a(c)(2) (providing that "applicants" for admission bear burden of establishing clear entitlement to admission) with 8 U.S.C. § 1129a(c)(3) (providing that, in the case of an alien lawfully admitted to the United States, government has burden of demonstrating by clear and convincing evidence that alien is deportable). We have found nothing in the legislative history, however, that reflects Congress's intent to limit the enforcement discretion long exercised by immigration officials in determining whether to pursue an alien's removal in the first instance. Rather, "many provisions of IIRIRA are aimed at *protecting* the Executive's discretion from the courts-indeed, that can fairly be said to be the theme of the legislation." *Reno*, 525 U.S. at 485-86 (emphasis added).

Finally, insofar as there is any ambiguity in these statutory provisions, this Court should defer to the Secretary's reasonable interpretation of them. *Chaney* holds that a reviewing court should generally defer to an agency's determination to refrain from enforcing a statute it is charged with administering. *Chaney*, 470 U.S. at 832. The

memoranda at issue here are consistent with decades of prior administrative practice, fully explain the reasons for deferring enforcement action, and, as *Chaney* indicates, concern prosecutorial decisions that are presumptively within the agency's broad discretion. For all these reasons, deference to the Secretary's interpretation is warranted. *See Siwe* v. *Holder*, 742 F.3d 603, 607 (5th Cir. 2014), citing *Skidmore* v. *Swift & Co.,* 323 U.S. 134 (1944).

Congress recently stated that "rather than simply rounding up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population, DHS must ensure that the government's huge investments in immigration enforcement are producing the maximum return in making our country safer." H.R. Rep. No. 111-157, 111th Cong., 1st Sess. 8 (2009). The DACA policy is fully consistent with that objective and well within the government's broad discretion to "to "establish[ ] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

## CONCLUSION

The district court's judgment dismissing the case for lack of

jurisdiction should be affirmed.  In the alternative, should the Court find

jurisdiction, it should remand the case with instructions to enter judgment

on the merits for the Secretary.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

SARAH R. SALDAÑA
 United States Attorney

MICHAEL JAY SINGER
 (202) 514-5432
/s/ JEFFREY CLAIR
 (202) 514-4028
jeffrey.clair@usdoj.gov

Attorneys, Civil Division
Room 7243, Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530

90

## FRAP 32(a)(7) CERTIFICATE OF COMPLIANCE

I certify that this brief has been prepared in Microsoft Word using a 14-point, proportionally spaced font, and that based on word processing software, the brief contains 15,200 words.

/s/ Jeffrey Clair

jeffrey.clair@usdoj.gov
(202) 514-4028

## CERTIFICATE OF SERVICE

I certify that on July 9, 2014, I electronically filed the foregoing Brief for the Federal Appellees/Cross-Appellants using the Court's CM/ECF system, which constitutes service under the Court's rules.

/s/ Jeffrey Clair

jeffrey.clair@usdoj.gov
(202) 514-4028

# STATUTORY AND REGULATORY ADDENDUM

1.  8 U.S.C. § 1225. . . . . . . . . . . . . . . . . . . . . . . . 1a

2.  8 U.S.C. § 1229a. . . . . . . . . . . . . . . . . . . . . . . 4a

3.  8 C.F.R. Part 1239. . . . . . . . . . . . . . . . . . . . . . 9a

4.  8 C.F.R. Part 239. . . . . . . . . . . . . . . . . . . . . . 12a

United States Code Annotated Currentness
Title 8. Aliens and Nationality (Refs & Annos)
Chapter 12. Immigration and Nationality (Refs & Annos)
Subchapter II. Immigration
Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

**➡§ 1225. Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing**

(a) Inspection

(1) Aliens treated as applicants for admission

An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

(2) Stowaways

An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer. Upon such inspection if the alien indicates an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B) of this section. A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B) of this section. In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 1229a of this title.

(3) Inspection

All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

(4) Withdrawal of application for admission

An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

(5) Statements

An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

(b) Inspection of applicants for admission

(1) Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled

(A) Screening

(i) In general

If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution.

\*  \*  \*

(2) Inspection of other aliens

(A) In general

Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

(B) Exception

Subparagraph (A) shall not apply to an alien--

(i) who is a crewman,

(ii) to whom paragraph (1) applies, or

(iii) who is a stowaway.

(C) Treatment of aliens arriving from contiguous territory

In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

(3) Challenge of decision

The decision of the examining immigration officer, if favorable to the admission of any alien, shall be subject to challenge by any other immigration officer and such challenge shall operate to take the alien whose privilege to be admitted is so challenged, before an immigration judge for a proceeding under section 1229a of this title.

* * *

United States Code Annotated Currentness
Title 8. Aliens and Nationality (Refs & Annos)
Chapter 12. Immigration and Nationality (Refs & Annos)
⌐▤Subchapter II. Immigration
⌐▤Part IV. Inspection, Apprehension, Examination, Exclusion, and Removal (Refs & Annos)

### ➡§ 1229a. Removal proceedings

(a) Proceeding

(1) In general

An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.

(2) Charges

An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 1182(a) of this title or any applicable ground of deportability under section 1227(a) of this title.

(3) Exclusive procedures

Unless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 1228 of this title.

(b) Conduct of proceeding

(1) Authority of immigration judge

The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses. The immigration judge may issue subpoenas for the attendance of witnesses and presentation of evidence. The immigration judge shall

4a

have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this chapter.

(2) Form of proceeding

(A) In general

The proceeding may take place--

**(i)** in person,

**(ii)** where agreed to by the parties, in the absence of the alien,

**(iii)** through video conference, or

**(iv)** subject to subparagraph (B), through telephone conference.

(B) Consent required in certain cases

An evidentiary hearing on the merits may only be conducted through a telephone conference with the consent of the alien involved after the alien has been advised of the right to proceed in person or through video conference.

(3) Presence of alien

If it is impracticable by reason of an alien's mental incompetency for the alien to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the alien.

(4) Alien's rights in proceeding

In proceedings under this section, under regulations of the Attorney General--

**(A)** the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

**(B)** the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national

security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this chapter, and

**(C)** a complete record shall be kept of all testimony and evidence produced at the proceeding.

(5) Consequences of failure to appear

(A) In general

Any alien who, after written notice required under paragraph (1) or (2) of section 1229(a) of this title has been provided to the alien or the alien's counsel of record, does not attend a proceeding under this section, shall be ordered removed in absentia if the Service establishes by clear, unequivocal, and convincing evidence that the written notice was so provided and that the alien is removable (as defined in subsection (e)(2) of this section). The written notice by the Attorney General shall be considered sufficient for purposes of this subparagraph if provided at the most recent address provided under section 1229(a)(1)(F) of this title.

(B) No notice if failure to provide address information

No written notice shall be required under subparagraph (A) if the alien has failed to provide the address required under section 1229(a)(1)(F) of this title.

(C) Rescission of order

Such an order may be rescinded only--

**(i)** upon a motion to reopen filed within 180 days after the date of the order of removal if the alien demonstrates that the failure to appear was because of exceptional circumstances (as defined in subsection (e)(1) of this section), or

**(ii)** upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice in accordance with paragraph (1) or (2) of section 1229(a) of this title or the alien demonstrates that the alien was in Federal or State custody and the failure to appear was through no fault of the alien.

The filing of the motion to reopen described in clause (i) or (ii) shall stay the removal of the alien pending disposition of the motion by the immigration judge.

(D) Effect on judicial review

Any petition for review under section 1252 of this title of an order entered in absentia under this paragraph shall (except in cases described in section 1252(b)(5) of this title) be confined to (i) the validity of the notice provided to the alien, (ii) the reasons for the alien's not attending the proceeding, and (iii) whether or not the alien is removable.

(E) Additional application to certain aliens in contiguous territory

The preceding provisions of this paragraph shall apply to all aliens placed in proceedings under this section, including any alien who remains in a contiguous foreign territory pursuant to section 1225(b)(2)(C) of this title.

(6) Treatment of frivolous behavior

The Attorney General shall, by regulation--

**(A)** define in a proceeding before an immigration judge or before an appellate administrative body under this subchapter, frivolous behavior for which attorneys may be sanctioned,

**(B)** specify the circumstances under which an administrative appeal of a decision or ruling will be considered frivolous and will be summarily dismissed, and

**(C)** impose appropriate sanctions (which may include suspension and disbarment) in the case of frivolous behavior.

Nothing in this paragraph shall be construed as limiting the authority of the Attorney General to take actions with respect to inappropriate behavior.

(7) Limitation on discretionary relief for failure to appear

Any alien against whom a final order of removal is entered in absentia under this subsection and who, at the time of the notice described in paragraph (1) or (2) of section 1229(a) of this title, was provided oral

notice, either in the alien's native language or in another language the alien understands, of the time and place of the proceedings and of the consequences under this paragraph of failing, other than because of exceptional circumstances (as defined in subsection (e)(1) of this section) to attend a proceeding under this section, shall not be eligible for relief under section 1229b, 1229c, 1255, 1258, or 1259 of this title for a period of 10 years after the date of the entry of the final order of removal.

(c) Decision and burden of proof

(1) Decision

(A) In general

At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

(B) Certain medical decisions

If a medical officer or civil surgeon or board of medical officers has certified under section 1222(b) of this title that an alien has a disease, illness, or addiction which would make the alien inadmissible under paragraph (1) of section 1182(a) of this title, the decision of the immigration judge shall be based solely upon such certification.

(2) Burden on alien

In the proceeding the alien has the burden of establishing--

**(A)** if the alien is an applicant for admission, that the alien is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 1182 of this title; or

**(B)** by clear and convincing evidence, that the alien is lawfully present in the United States pursuant to a prior admission.

In meeting the burden of proof under subparagraph (B), the alien shall have access to the alien's visa or other entry document, if any, and any other records and documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States.

(3) Burden on service in cases of deportable aliens

(A) In general

In the proceeding the Service has the burden of establishing by clear and convincing evidence that, in the case of an alien who has been admitted to the United States, the alien is deportable. No decision on deportability shall be valid unless it is based upon reasonable, substantial, and probative evidence.

(B) Proof of convictions

In any proceeding under this chapter, any of the following documents or records (or a certified copy of such an official document or record) shall constitute proof of a criminal conviction:

**(i)** An official record of judgment and conviction.

**(ii)** An official record of plea, verdict, and sentence.

**(iii)** A docket entry from court records that indicates the existence of the conviction.

**(iv)** Official minutes of a court proceeding or a transcript of a court hearing in which the court takes notice of the existence of the conviction.

**(v)** An abstract of a record of conviction prepared by the court in which the conviction was entered, or by a State official associated with the State's repository of criminal justice records, that indicates the charge or section of law violated, the disposition of the case, the existence and date of conviction, and the sentence.

**(vi)** Any document or record prepared by, or under the direction of, the court in which the conviction was entered that indicates the existence of a conviction.

**(vii)** Any document or record attesting to the conviction that is maintained by an official of a State or Federal penal institution, which is the basis for that institution's authority to assume custody of the individual named in the record.

## § 1239.1 Notice to appear.

(a) Commencement. Every removal proceeding conducted under section 240 of the Act (8 U.S.C. 1229a) to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the immigration court. For provisions relating to the issuance of a notice to appear by an immigration officer, or supervisor thereof, see 8 CFR 239.1(a).

(b) Service of notice to appear. Service of the notice to appear shall be in accordance with section 239 of the Act.

## § 1239.2 Cancellation of notice to appear.

(a) Prior to commencement of proceedings. For provisions relating to the authority of an immigration officer to cancel a notice to appear prior to the vesting of jurisdiction with the immigration judge, see 8 CFR 239.2(a) and (b).

(b) [Reserved]

(c) Motion to dismiss. After commencement of proceedings pursuant to 8 CFR 1003.14, government counsel or an officer enumerated in 8 CFR 239.1(a) may move for dismissal of the matter on the grounds set out under 8 CFR 239.2(a). Dismissal of the matter shall be without prejudice to the alien or the Department of Homeland Security.

(d) Motion for remand. After commencement of the hearing, government counsel or an officer enumerated in 8 CFR 239.1(a) may move for remand of the matter to the Department of Homeland Security on the ground that the foreign relations of the United States are involved and require further consideration. Remand of the matter shall be without prejudice to the alien or the Department of Homeland Security.

(e) Warrant of arrest. When a notice to appear is canceled or proceedings are terminated under this section any outstanding warrant of arrest is canceled.

(f) Termination of removal proceedings by immigration judge. An immigration judge may terminate removal proceedings to permit the alien to proceed to a final hearing on a pending application or petition for naturalization when the alien has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.

## § 1239.3 Effect of filing notice to appear.

The filing of a notice to appear shall have no effect in determining periods of unlawful presence as defined in section 212(a)(9)(B) of the Act.

Code of Federal Regulations Currentness
Title 8. Aliens and Nationality
Chapter I. Department of Homeland Security (Refs & Annos)
Subchapter B. Immigration Regulations
➡Part 239. Initiation of Removal Proceedings (Refs & Annos)

## § 239.1 Notice to appear.

(a) Issuance of notice to appear. Any immigration officer, or supervisor thereof, performing an inspection of an arriving alien at a port-of-entry may issue a notice to appear to such alien. In addition, the following officers, or officers acting in such capacity, may issue a notice to appear:

(1) District directors (except foreign);

(2) Deputy district directors (except foreign);

(3) Chief patrol agents;

(4) Deputy chief patrol agents;

(5) Assistant chief patrol agents;

(6) Patrol agents in charge;

(7) Assistant patrol agents in charge;

(8) Field operations supervisors;

(9) Special operations supervisors;

(10) Supervisory border patrol agents;

(11) Service center directors;

(12) Deputy service center directors;

(13) Assistant service center directors for examinations;

(14) Supervisory district adjudications officers;

(15) Supervisory asylum officers;

(16) Officers in charge (except foreign);

(17) Assistant officers in charge (except foreign);

(18) Special agents in charge;

(19) Deputy special agents in charge;

(20) Associate special agents in charge;

(21) Assistant special agents in charge;

(22) Resident agents in charge;

(23) Supervisory special agents;

(24) Directors of investigations;

(25) District directors for interior enforcement;

(26) Deputy or assistant district directors for interior enforcement;

(27) Director of detention and removal;

(28) Field office directors;

(29) Deputy field office directors;

(30) Supervisory deportation officers;

(31) Supervisory detention and deportation officers;

(32) Directors or officers in charge of detention facilities;

(33) Directors of field operations;

(34) Deputy or assistant directors of field operations;

(35) District field officers;

(36) Port directors;

(37) Deputy port directors;

(38) Supervisory service center adjudications officers;

(39) Unit Chief, Law Enforcement Support Center;

(40) Section Chief, Law Enforcement Support Center; or

(41) Other officers or employees of the Department or of the United States who are delegated the authority as provided by 8 CFR 2.1 to issue notices to appear.

(b) Service of notice to appear. Service of the notice to appear shall be in accordance with section 239 of the Act.

## § 239.2 Cancellation of notice to appear.

(a) Any officer authorized by § 239.1(a) to issue a notice to appear may cancel such notice prior to jurisdiction vesting with the immigration judge pursuant to § 3.14 of this chapter provided the officer is satisfied that:

(1) The respondent is a national of the United States;

(2) The respondent is not deportable or inadmissible under immigration laws;

(3) The respondent is deceased;

(4) The respondent is not in the United States;

(5) The notice was issued for the respondent's failure to file a timely petition as required by section 216(c) of the Act, but his or her failure to file a timely petition was excused in accordance with section 216(d)(2)(B) of the Act;

(6) The notice to appear was improvidently issued, or

(7) Circumstances of the case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government.

(b) A notice to appear issued pursuant to section 235(b)(3) of the Act may be canceled under provisions in paragraphs (a)(2) and (a)(6) of this section only by the issuing officer, unless it is impracticable for the issuing officer to cancel the notice.

(c) Motion to dismiss. After commencement of proceedings pursuant to 8 CFR 1003.14, ICE counsel, or any officer enumerated in paragraph (a) of this section, may move for dismissal of the matter on the grounds set out under paragraph (a) of this section.

(d) Motion for remand. After commencement of the hearing, ICE counsel, or any officer enumerated in paragraph (a) of this section may move for remand of the matter to district jurisdiction on the ground that the foreign relations of the United States are involved and require further consideration.

(e) Warrant of arrest. When a notice to appear is canceled or proceedings are terminated under this section any outstanding warrant of arrest is canceled.

## § 239.3 Effect of filing notice to appear.

The filing of a notice to appear shall have no effect in determining periods of unlawful presence as defined in section 212(a)(9)(B) of the Act.